

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

LHE:LM
F. #2022R00078

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 6, 2023

<u>By E-mail</u>

Honorable Taryn A. Merkl
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Justin Dixon</u>
     <u>Docket No. 23-mj-120 (TAM)</u>

Dear Judge Merkl:

  The government respectfully submits this letter in support of its application for the entry of a permanent order of detention for the defendant Justin Dixon (the "defendant" or "Dixon"). The defendant is charged by Complaint with sex trafficking of a minor, in violation of 18 U.S.C. § 1591, which carries a mandatory minimum sentence of ten years.

  As described below, since at least August 2022, the defendant has been operating as a "pimp" who used violence and the threat of violence to compel the commission of commercial sex acts by others, including by minors as young as fourteen years old, for his financial benefit. For the reasons set forth below, the government submits that no combination of conditions can reasonably secure the defendant's appearance at trial or the safety of the community.

BACKGROUND

 A. <u>The Charged Conduct</u>

  The Penn Track is a small geographical area off of Pennsylvania Avenue in East New York, Brooklyn. It runs from Flatlands Avenue in the south up north to Linden Boulevard, and from Louisiana Avenue in the west to Pennsylvania Avenue in the east. Like other open area environments where prostitution occurs, the Penn Track is commonly referred to as "the track" and "the blade."

  Nightly along the Penn Track, individuals who are engaged in sex trafficking and/or involved in promoting prostitution drop off females who work for them in prostitution. Typically, customers along the track drive up to the females and arrange for commercial sex acts

with them. Commercial sex acts typically occur in the customers' vehicles, in public on the street, and in nearby hotels and motels.

Since in or around November 2022, the Federal Bureau of Investigation ("FBI") and the New York Police Department ("NYPD") developed information about an individual, subsequently identified as Dixon, who was operating a sex trafficking business in Brooklyn, New York and elsewhere.

On or around January 26, 2023, law enforcement officers learned that a fourteen-year-old minor ("Jane Doe") was being held against her will at a house in Staten Island (the "Staten Island House"), where Dixon lived along with other adult females that law enforcement believes were also being forced by Dixon into prostitution, through violence or threats of violence.

The investigation revealed that, on or about January 22, 2023, after communicating with Jane Doe via Instagram direct messages, Dixon picked up Jane Doe from the place where she was residing and took her to the Staten Island House, where at least two other women were living with Dixon. Almost immediately thereafter, until his arrest on January 26, 2023, Dixon transported Jane Doe on multiple occasions to the Penn Track and forced her to engage in sexual acts with unknown individuals in exchange for monetary payments. Dixon would then collect the payments and transport Jane Doe back to the Staten Island House.

The investigation has also revealed that Dixon illegally possessed two firearms, and brandished those firearms near the presence of Jane Doe and other victims. Moreover, on or about January 26, 2023, upon executing a search warrant of the Staten Island House and of one of the defendant's vehicles, law enforcement officers found one of these two firearms inside the defendant's vehicle. The defendant has prior felonies in his criminal record and was not allowed to possess a firearm.

The defendant used force and threat of force to enforce the rules in the Staten Island House. For example, on one occasion, the defendant slapped Jane Doe and stated that he did not like the way that she was looking at him. The defendant also forced Jane Doe and the other two adult women who lived in the Staten Island House to clean the house, cook and bathe the defendant, and prohibited them from wearing clothes inside the Staten Island House.

Furthermore, the investigation revealed that the defendant would call Jane Doe "tiny," presumably due to her petite figure as a small fourteen-year-old. Dixon constantly overfed Jane Doe and consistently told her that she needed to eat more, in order to look older than her current age. The defendant also told Jane Doe that he was arranging a trip to Florida with Jane Doe and that he wanted to arrange plastic surgery for Jane Doe, including breast implants, in order to make her appear older than her current age. Moreover, Dixon provided Jane Doe with unknown pills in order to, according to him, increase Jane Doe's appetite.

The defendant utilized social media and other internet applications to establish relationships with potential victims, groomed those victims by conveying a romantic interest in them, manipulated them into working for him as prostitutes, and then effectively enslaved them through acts of force and coercion. For various victims, including the victims referred to in the Complaint and above, the defendant acted as a "pimp," who directed when, where and with whom

commercial sex acts would be performed. Resistance to Dixon was met with violence or the threat of violence. Any money earned that Dixon did not collect himself was immediately due to him and withholding money from him was an offense punishable by violence. In order to maintain control over his victims, the defendant alternately showed affection and acted violently, including by beating his victims. The defendant tracked Jane Doe's and other female victims' phones. Additionally, during this time period, the defendant was affiliated with the Crips street gang.

B. The Defendant's Criminal History

On or about September 6, 2018, the defendant was arrested and charged with Criminal Possession of a Weapon and Criminal Possession of a Loaded Firearm in the Second Degree. On or about August 22, 2019, the defendant was convicted upon pleading guilty to the criminal possession of a firearm charge.

On or about May 12, 2017, the defendant was arrested and charged with two felony counts and one misdemeanor count also involving the illegal possession of a firearm. On or about August 22, 2019, the defendant was convicted upon pleading guilty to the criminal possession of a firearm charge. The defendant was also arrested and charged with a firearm offense on or about June 5, 2010.

The defendant also has a 2016 conviction for Aggravated Unlicensed Operation of a Vehicle, a 2016 conviction for Criminal Mischief Intent to Damage Property and a 2015 conviction for Criminal Contempt and for Operating a Motor Vehicle Impaired by Drugs. Additionally, an order of protection was issued on or about August 22, 2019 against the defendant, which prohibited Dixon, among other things, from contacting the protected victim and from purchasing or possessing a firearm. That order of protection was still active at the time of the defendant's arrest.

DISCUSSION

A. Legal Standard and Procedure

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A rebuttable presumption of dangerousness and risk of flight arises when a defendant is charged with a violation of § 1591. 18 U.S.C. § 3142(e)(3)(E). The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. The defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven

3

by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).  The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Four factors guide the Court's determination of whether a defendant should be released on bail:

>    (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";
>
>    (2) "the weight of the evidence against the person";
>
>    (3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and
>
>    (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).  In the pre-trial context, few detention hearings involve live testimony or cross-examination.  Most proceed on proffers.  Id. at 131.  This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery."  Id. (internal quotation marks omitted).  Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness.  See, e.g., Mercedes, 254 F.3d at 437 ("Roman has twice been convicted of weapon possession – one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to Roman's dangerousness.").

B. Argument

   1. A Presumption of Dangerousness and Risk of Flight Applies

Because the defendant is charged with sex trafficking, in violation of 18 U.S.C. § 1591, there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  Id. § 3142(e)(3)(E).  The defendant will not be able to rebut the presumption given the serious danger he poses to the community, including any witnesses against him, as well as the risk that

4

he will try to flee given the significant mandatory minimum sentence he is facing. Moreover, even if the presumption did not exist, the government can establish by clear and convincing evidence that the defendant is a danger to the community, and by a preponderance of the evidence that the defendant is a risk of flight.

### 2. The Defendant Poses a Danger to the Community

No bail package will protect the community from the danger posed by the defendant. First, Dixon is a prior felony offender with an escalating propensity towards violence. Indeed, he has three prior weapon convictions and, as described above, was engaging in acts and threats of violence in enslaving various women—including a fourteen-year-old victim—and trafficking them in the Penn Track.

Furthermore, the conduct with which the defendant is charged is incredibly serious. As a "pimp"—up until the very moment of his arrest in this case—the defendant used physical violence and the threat of physical violence to assert his dominance. The brazenness and callousness of the defendant's conduct in the instant case, particularly when coupled with his extensive criminal history, reveals his total disregard for the law and the well-being of others.

Finally, Dixon has a pattern of disobeying the law, as noted above. Indeed, even after various prior weapon convictions, the investigation has revealed that Dixon was in illegal possession of firearms at the time of his arrest. He was in possession of these firearms while living at the Staten Island House where he had forced Jane Doe and other victims to stay in order to force them into prostitution. Thus, in light of the defendant's pattern of disobeying the law, he presents a tangible risk to the witnesses in this case, who he has a history of manipulating, threatening and beating. That risk is compounded by the significant jail time the defendant faces, which gives a strong incentive to intimidate the witnesses against him and otherwise obstruct the investigation.

### 3. The Defendant Poses a Risk of Flight

The defendant poses a significant risk of flight given his demonstrated pattern of disregard for the law and the fact that he faces a mandatory minimum sentence of ten years on the sex trafficking charge. When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure his appearance. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order) ("[T]he presumption regarding flight risk has changed because Becton now faces a ten-year mandatory minimum sentence."). That remains true even if the defendant accepts electronic surveillance and home confinement. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

CONCLUSION

        The defendant is charged with one of the most serious federal crimes involving the sexual exploitation of children. Some of the defendant's victims are the most vulnerable members of our community. For all these reasons, the government respectfully requests that the Court issue a permanent order of detention against the defendant as he is a danger to the community and a risk of flight.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Lorena Michelen
Lorena Michelen
Assistant U.S. Attorney
718-254-6475

cc:    Clerk of Court (TAM) (by email)
      Defense Counsel (by email)