# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

November 5, 2025

**Via ECF and Email**
The Honorable William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    **United States v. Justin Dixon, 23-CR-90 (WFK)**

Your Honor:

I write in anticipation of sentencing, currently scheduled for November 21, 2025. Justin Dixon has been incarcerated at MDC Brooklyn for nearly three years, and faces at least a ten-year prison sentence. Since birth, Mr. Dixon has suffered a lifetime of abandonment, trauma, and poverty. Working in the adult prostitution business provided a misguided sense of belonging and income to a man who had come to believe he was not capable of otherwise attaining a successful lifestyle. When he brought into his employment a minor, who had materially misrepresented herself, Mr. Dixon clearly made an enormous error in judgment, justifying a significant sentence. He has taken full accountability for conduct that—though clearly reprehensible—spanned four days. Due to the unique circumstances of his case, the government and Mr. Dixon have agreed to recommend a sentence between 180 and 210 months. We respectfully submit that a fifteen-year sentence is appropriate.

## I.    Objections to the Presentence Investigation Report

On July 15, 2025, the Probation Department filed an Addendum to the Presentence Investigation Report ("PSR"), adopting Mr. Dixon's objection to his criminal history category. As amended, Mr. Dixon has no objection to a Total Offense Level of 35[1] and a Criminal History Category of III. The PSR accurately describes Mr. Dixon's personal history. While he does not object to the offense characteristics, we dispute certain characterizations in Part III.

---

[1] The PSR arrives at Total Offense Level 35 through a calculation of Level 38 for each of Counts Two and Four, less three points for acceptance of responsibility. PSR ¶¶16, 17, 25-32, 33-46. In the Plea Agreement, the parties arrived at the same Total Offense Level 35 through a calculation of Level 38 for Count Two and Level 18 for Count Four, minus acceptance points. ECF No. 35 at 3-4. Similarly, the PSR appears to erroneously use Guideline 2G1.1, which applies to "promoting a commercial sex act by other than a minor," while the parties use Guideline 2G1.3, which applies to minors. Both guidelines invoke a cross-reference to Guideline 2A3.1, producing the same offense levels. Because the result of the PSR and plea agreement guidelines calculations are the same, the differences are immaterial.

Mr. Dixon objects to the Special Condition of Supervised Release described in Paragraph 119 of the initial PSR, and repeated in Paragraph 139 of the Second Addendum, requiring his participation in Probation's Computer and Internet Management/Monitoring ("CIMP") Program following his release. This condition would require Mr. Dixon to install monitoring software on any internet-capable device that he possesses while on supervised release, including his cell phone. We respectfully submit that this condition, which is highly onerous and a significant intrusion on Mr. Dixon's privacy, is not justified by his crimes of conviction or offense conduct. Particularly given the significant term of incarceration he will serve, the application of this condition at least a decade from now is unwarranted.

The CIMP condition is generally applied by the Probation Department to individuals convicted of child pornography (and sometimes terrorism) offenses. Though Mr. Dixon's offense will result in his mandatory sex offender registration, that status does not itself mandate the CIMP condition. His offense consisted of compelling a minor to engage in prostitution, not for the production, distribution, or possession of child pornography. Mr. Dixon used his cell phone to exchange text messages—none of a sexual nature—with the minor prior to her moving into his home. That cannot justify around-the-clock surveillance of his cell phone, what the Supreme Court has accurately described as "the sum of an individual's private life" and "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude [it was] an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 394, 385 (2014). Because cell phones are at the zenith of privacy interests, a warrant is generally required to search them, and should be so required here.

Mr. Dixon objects to, and moves to strike, Paragraph 59 in its entirety, as Probation has been unable to confirm it via court records, and Mr. Dixon was not convicted of any offense resulting from this arrest. "Other arrest" records that are not resolved by court dispositions serve as detainers within the Bureau of Prisons, impacting a defendant's security classification, designation, and eligibility for programming and eventual release. Because the Kings County Criminal and Supreme Courts would not confirm this arrest, or any disposition, it should be stricken from the PSR.

## II.    Mr. Dixon's Childhood and Adolescence Were Marked by Trauma and Abandonment, Providing Context and Mitigation

Exhibit A is a psychosocial mitigation report prepared by Federal Defenders of New York mitigation social worker Olivia Cahue-Diaz. Ms. Cahue-Diaz's report reflects information learned over more than one year of interviews with Mr. Dixon, her review of numerous records spanning his life, and discussions with his family members. *Id*. at 1. The report reflects a broken childhood and adolescence through which Mr. Dixon lacked emotional and material security and safety, such that he was predisposed to poor decision-making and a failure to appropriately consider consequences. Short-term, impulsive thinking led him to reset his moral compass, to disastrous ends. Mr. Dixon describes these life experiences, and their effects on him, in his own letter to the Court. Ex. B.

Mr. Dixon was born with crack cocaine in his system, the son of a young mother and a father he'd never know. PSR ¶ 65, Ex. A at 1. Fearful of criminal or child abuse and neglect

charges, his mother left the hospital without him; unfortunately, it was the perfect preview of his life to come. To ensure that he was not lost to strangers in the foster care system, Mr. Dixon's aging grandparents agreed to assume his care. Ex. A at 2. They had already taken in his older sister, who was three years old, his mother having already failed to raise one child before having another. *Id.* The home was crowded, unstable, and inappropriate for the care of children. Justin and his sister grew up sharing space with his grandparents, two uncles, an aunt, and the on-and-off presence of his mother. *Id.* One of the uncles was addicted to heroin and alcohol, the aunt, too, was an alcoholic, and his mother's priority throughout his life (to the present day) was her addiction to crack cocaine. *Id.* Mr. Dixon's childhood memories are marked by the omnipresence of addiction and its effects in his home. He and his sister recall numerous experiences of their mother coming home high. *Id.* His formative memory, at around seven years' old, is of watching his grandparents kick his mother out of the home for stealing their engagement ring. *Id.*, PSR ¶ 65. By first grade, he was walking to school alone, left effectively to his own devices. Ex. A at 2.

It comes as no surprise that an early childhood of instability and neglect produced a confused and angry child who failed to develop appropriate coping strategies. *Id.* at 3. School records evince an easily distracted, hyperactive child prone to acting out when frustrated. *Id.* Though school staff recommended medication, his grandmother refused it, and his challenges remained and grew without intervention. *Id.* When he turned ten, his grandparents attempted to remove Justin and his sister from the distractions and chaos of the drug-addled adults in the house, moving them to North Carolina. *Id.* The change of scenery reduced the noise, but it also separated Justin from his maternal aunt who, despite her struggles with alcoholism, had provided him the only "genuine love" he experienced as a child. *Id.*, PSR ¶ 65. The experience alone with their grandparents as an early adolescent made Justin grow to be "independent in a cold way." PSR ¶ 65. He was physically disciplined. *Id.* The time in North Carolina was short-lived: his grandfather was diagnosed with peripheral artery disease, developed a post-surgical infection, and died suddenly. Ex. A at 4.

Alone now as an elderly woman with two grandchildren, Mr. Dixon's grandmother moved him and his sister back to Brooklyn. *Id.* Though he was reunited with his aunt, the family had lost their Bedford-Stuyvesant apartment and was now in a dangerous, gang-infested part of Crown Heights; his family's poverty was endemic to his surroundings. *Id.* By thirteen years old, and the eighth grade, Mr. Dixon had begun using drugs, affiliating with a gang, selling drugs, and serving over a year in juvenile detention. *Id.* At only sixteen, his grandmother kicked him out of her home. PSR ¶ 65. He resided in a decrepit New Jersey motel for six months, and then a roach, spider, and rat-infested apartment. *Id.* Predictably, after numerous lapses, he dropped out of school in the tenth grade. Ex. A at 5, PSR ¶ 85. By nineteen, he was cycling in-and-out of the criminal justice system.

Gang culture layered upon his developmental trauma left him feeling inadequate; he yearned for material success that he believed would make up for the emptiness of his childhood. Over the next ten years, he made money, but he also lost his relationship with his sister, who rejected his illicit lifestyle. PSR ¶ 64. And then he lost his aunt, leaving deep emotional scars. Ex. A at 5. He filled the gap with a deepening and widening dependence on drugs. *Id.*, PSR ¶¶ 79-82. For a time, Justin was able to thrive off his aunt's legacy. Prior to her death, she received a large settlement from a lawsuit, and helped him to start a car rental and car wash businesses.

3

When she died, his inheritance allowed him to purchase more cars to grow the business. Then Covid hit. *See* Ex. B. Demand fell and bills piled up. *Id*. Without any training or mentors on how to run complex businesses, they collapsed. A sense of failure, compounded by greed and fueled by addition, led him into dark places. The adult prostitution business gave Mr. Dixon a warped sense of belonging, control, and success. Ex. A at 5. On the Penn Track, the open and unpoliced buying and selling of sex reflected a warped social compact. *See, e.g.*, Matthew Sedacca and Tina Moore, *Open-air sex market is exploding in Brooklyn as hookers openly sell themselves along the Penn Track: pol*, New York Post (Nov. 3, 2024), at https://nypost.com/2024/11/03/us-news/nyc-open-air-sex-market-is-exploding-as-hookers-openly-sell-themselves-along-the-penn-track-pol/ (noting only four prostitution-related arrests in the area in 2022, nineteen in 2023, and eighteen as of that date in 2024). In a culture marked by vicious violence and retribution, Mr. Dixon compared favorably to his peers. *See* Part III.

Unquestionably, bringing a minor into his business reflected a deeply distorted reality. That serious lapse of judgment has deservedly changed the course of Mr. Dixon's life. His partner was pregnant when he was arrested; he's missed the birth and first three years of his namesake's life. Having just turned thirty-five years' old, Mr. Dixon will spend at least a decade in prison as a sex offender, ensuring a dangerous and challenging incarceration. When he was first incarcerated at the MDC, Mr. Dixon brought his street mentality with him inside the prison, where it found a similarly chaotic, violent, and corrupted home. *See* Part IV. In October of 2024, Mr. Dixon's grandmother died at 100 years old. Worse yet, he learned about her passing through his defense team. Missing his grandmother's death heightened the loss left by missing his son's birth and finally caused a significant shift in his thinking. Mr. Dixon was exhausted by the constant vigilance required in a violent prison, where he witnessed an inmate murder right in front of him. He requested a transfer to a different unit, away from negative peer influences. He notably increased his participation in educational courses and saw a corresponding decrease in disciplinary action. *See* Ex. C (educational certificates). From September 2024 through May 2025, he completed a full-year Columbia University political science course on the American presidency. Mr. Dixon has accepted full accountability for his crimes and knows that he will serve a long sentence. He is committed, now, to his faith, his education, and charting a different path forward for his eventual release.

## III.    Mr. Dixon's Offense Conduct Compares Relatively Favorably to Similar Cases

Mr. Dixon's crimes of conviction—coercion and enticement of a minor to engage in prostitution, and felon in possession of a firearm—are undeniably serious. But as with all aspects of human life, they exist in a context. Mr. Dixon's arrest for "pimping" on the Penn Track was one of several made by the government in this District from 2023-2024. As evinced by the November 2024 article above, these arrests have not stemmed the tide of open-air prostitution in the area, as Mr. Dixon and the others have been replaced by other pimps and sex workers to meet the persistent demand of an intransigent social problem. In context, the facts of Mr. Dixon's case illustrate why a fifteen-year sentence is appropriately severe, and well in line with even more aggravated cases of this type.

### a. The Instant Offense Spanned Four Days, Involving One Victim and Minimal Violence

The PSR paints a picture of Mr. Dixon's business that is at odds with reality and with the charges brought by the government. The PSR characterizes the "many" women employed by Mr. Dixon as "enslaved through acts of force of coercion." PSR ¶ 8. If so, the limitations of the indictment are puzzling. Mr. Dixon was charged solely with prostitution-related counts related to Jane Doe #1 in January 2023. *See* ECF No. 8, Counts One, Two, and Three. Otherwise, he is charged with possession of two guns. *Id*. at Counts Four and Five. The government appears to have identified Mr. Dixon through a wiretap of Douglas Welch, one of his associates, in November 2022. PSR ¶ 7, *see United States v. Scott*, 24-CR-158 (KAM), ECF No. 63 at 3-6. The government also developed significant information about Mr. Dixon through a witness in Mr. Scott's case, an adult woman sex worker, who intended to leave her pimp to work for Mr. Dixon but was thwarted by this arrest in late January 2023. *See id*., ECF No. 123 at 32-43. Despite their investigation, which has presumably continued, the government did not bring any other charges against Mr. Dixon relating to any other women, whether for sex trafficking, promotion of prostitution, transportation for illegal sexual activity, or any other offense. Everyone else who worked for Mr. Dixon, each of whom was arrested alongside him from his home, was an adult, and their employment apparently did not support that they were sex trafficked by him by force. *See* 18 U.S.C. 1591(a).

Mr. Dixon's charges, then, relate to one sex worker who worked for him for four days. That this person turned out to be fourteen years old is, to be sure, abhorrent. But before joining Mr. Dixon's home, the minor materially misrepresented herself to him as an adult sex worker. Her Instagram account, received from the government in discovery, shows that prior to meeting Mr. Dixon, she advertised herself online as a "sex therapist." Ex. D.[2] She posted scantily clad sexual photographs of herself, with alcohol and guns. Ex. E. After first meeting Mr. Dixon in September 2022, and without any contact from him since, Jane Doe contacted Mr. Dixon in January 2023 seeking to be employed by him. While the minor unquestionably turned out to be legally unable to consent to sex work, she sought out this work willingly.

Nor was she "enslaved" by "violence" over the four-day period in which she worked for Mr. Dixon, from January 22-26, 2023. While no quantum of violence is acceptable or justifiable, the government charges that Mr. Dixon slapped Jane Doe one time. PSR ¶ 11. He is not alleged to have threatened her with guns. Cell phone records demonstrate that on January 24, Mr. Dixon had no prostitution-related communication with Jane Doe at all, and that he was in Connecticut without her. She had access to her cell phone, texting her mother on January 25 that she had already made five hundred dollars. Around 1:40am on January 26, she apparently had unfettered access to his gun, making cell phone videos of herself with it alone in the bathroom, rather than being threatened by it. Ex. F. From approximately 11:45am until at least 12:50pm on January 26, Mr. Dixon was being treated at a Staten Island CityMD for an illness. Ex. G. And body-worn camera footage records Jane Doe telling the responding officers that Mr. Dixon had told her "she could leave any time," though she did not believe him. Indeed, Jane Doe reported to the

---

[2] In accordance with the protective order in this case, we respectfully request to file victim-related exhibits under seal.

investigating agents that while she was there, another woman decided to leave, and Mr. Dixon readily drove her back to where he had picked her up.

> **b. Considerations Underlying the Advisory Guidelines Range Reflect More Aggravated Conduct than Mr. Dixon's**

At the outset, the parties agree that Mr. Dixon's advisory sentencing guidelines are 210-262 months. Probation recommends a bottom-of-the-guidelines sentence of 210 months; the government and Mr. Dixon agree that a sentence between 180-210 months is appropriate. Pursuant to Guideline 2G1.3, and its cross-reference to Guideline 2A3.1, Mr. Dixon faces a six-level enhancement, from base offense level 28 to effectively 34 based on the use of force, or "conduct described in 18 U.S.C. § 2241(a)." Here, that force was limited to one slap and the presence of two guns in Mr. Dixon's home and car. While Mr. Dixon concedes the applicability of the cross-reference, some other cases regarding "conduct described in 2241" that trigger the cross-reference are useful comparisons. *E.g.*, *United States v. Sadeek*, 77 F.4th 320, 325 (5th Cir. 2023) (defendant raped victim multiple times, physically prevented her escape, physically restrained her, and crushed her to the point of her being unable to breathe); *United States v. Ray*, 831 F.3d 431, 435 (7th Cir. 2016) (defendant pushed victim, climbed on top of her, and penetrated her while she was trying to resist); *United States v. Wardlow*, 830 F.3d 817, 823 (8th Cir. 2016) (defendant drove victim to area of town where girls were often found dead and told her she would be there to "place ideas into her head of fear"). Conversely, Mr. Dixon is not alleged to have had any sexual contact with Jane Doe, nor remotely the level or type of force employed in those cases.

An examination of Guideline 2G1.3 and its attendant levels demonstrate structural flaws untethered to conduct or harm. When Congress passed the PROTECT Act in 2004, it restructured the Guidelines to create 2G1.3. The first version of 2G1.3 included a single base offense level of 24, "to account for the new mandatory minimum terms of imprisonment established by the PROTECT Act." U.S.S.G. Amendment 664. When Congress raised mandatory minimums for these offenses in July 2006 with the passage of the Adam Walsh Act, the Sentencing Commission responded to the increased mandatory minimums with Amendment 701, which created correspondingly higher offense levels. Other than keeping pace with the statutory changes, no rationale or empirical data was cited as the basis for these increases. U.S.S.G. Amendment 701. While Congress is of course free to raise minimum sentences, the Supreme Court has indicated that the Sentencing Commission's recommended sentences are entitled to less deference when they are designed simply to keep pace with Congressional action. *See Kimbrough v United States*, 552 U.S. 85, 109. Pegging the guideline to a mandatory minimum as opposed to the sentencing experience and wisdom of courts was used in constructing the cocaine base Guidelines. In such a case it is less likely that the Guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109-10; *see also United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (child pornography guideline entitled to less deference for same reason). Section 2G1.3 suffers from this same defect and thus the Guidelines here are owed similarly less deference.

6

### c. Outcomes in Comparable Pimping of Minors Cases Support a Fifteen-Year Sentence

A wide range of comparable cases in the Southern and Eastern Districts of New York support Mr. Dixon's request for a fifteen-year sentence; indeed, his conduct compares favorably to these cases. In *United States v. Exavier and Newsome*, the defendants trafficked a minor throughout Long Island for five months, and attempted to pimp a twelve-year-old. 19-CR-70 (JS), *see* ECF No. 103. They were sentenced to 120 and 144 months, respectively. In *United States v. Miller*, the defendant sex trafficked at least twelve minors, prostituted a seventeen- and fourteen-year-old for months, and had sex with two minor victims. 16-CR-536 (KAM), *see* ECF No. 68. On a guilty plea to a 10-year mandatory minimum, as here, Mr. Miller received a 15-year sentence, roughly half the Guideline range of 324 to 405 months calculated by the Court. *Id.* In *United States v. Jones*, Judge Irizarry sentenced the defendant to 151 months for pimping a seventeen- and an eleven-year-old. 07-CR-866 (DLI). In *United States v. Mason*, the defendant sex trafficked a child for three years, in addition to running an adult prostitution business and selling drugs; he was sentenced to 156 months. 18-CR-461 (LDH), *see* ECF No. 17. In *United States v. Adams*, the defendant ran a prostitution ring for a decade, pimping girls as young as twelve, and had sex with a fourteen-year-old prostitute, who he beat while pregnant, causing a miscarriage. 14-CR-650 (MKB) (JBW), *see* ECF No. 123 at 10-11. His guidelines were 324-405 months; Judge Weinstein sentenced him to fifteen years. *Id*.

Southern District cases are likewise instructive. In *United States v. Concepcion*, the defendant was convicted after trial of three counts of sex trafficking a minor, whom he raped. 19-CR-883 (JPO) (S.D.N.Y.), *see* ECF No. 164 at 2 (Tr. at 114-15). Despite guidelines of 360-life, the government requested an 180-month sentence, and the court sentenced Mr. Concepcion to 144 months. In *United States v. Paschal*, a defendant was convicted after trial for pimping adult and minor sex workers for two months, or significantly longer than Mr. Dixon did. 21-CR-331 (VB) (S.D.N.Y.), *see* ECF No. 132 at 16. He was sentenced to132 months. In *United States v. Myrie*, the defendant recruited and sex trafficked a minor and used physical violence to maintain control over her; he was sentenced to 135 months. 18-CR-527 (KMW) (S.D.N.Y.). In *United States v. Corley*, the court imposed a sentence of 120 months' imprisonment, departing from the Guidelines, which suggested a sentence of 210 to 262 months' imprisonment. 13-CR-48 (RPP) (S.D.N.Y), *see* ECF No. 60 at 3. That defendant was convicted after trial of three counts of sex trafficking of a minor as well as possession of child pornography based on evidence that he ran a sophisticated prostitution enterprise specializing in underage girls. *Id.* In *United States v. Dykes*, the court imposed a 114-month sentence, significantly below the guidelines range of 262-327 months, on a defendant who ran prostitution ring involving minors as young as 13 and had a history of violence against women (including choking and face cutting). 16-CR-670 (KMW) (S.D.N.Y), *see* ECF No. 197 at 1.

### d. Mr. Dixon's Case Compares Favorably to the Other Penn Track Cases

As described above, Mr. Dixon was not the only pimp arrested federally for work on the Penn Track; rather, the EDNY United States Attorney's Office made a string of these arrests.

They evince a shocking culture of extreme violence in which Mr. Dixon played no role. In *United States v. (Napoleon) Scott*, the defendant hit the sex workers he employed with belts, in addition to slapping, kicking, punching, and dragging them, as well as threatening their family members. 22-CR-156 (MKB), *see* ECF No. 132 at 2. He had a pattern of arrests for physically abusing women. *Id*. He attempted to witness tamper from jail. *Id*. Judge Brodie sentenced him to 160 months.

The other related defendants are not yet sentenced. In *United States v. Welch*, 23-CR-411 (MKB), the government describes the defendant as having

> "routinely threatened his victims with physical violence if they disobeyed his orders, telling one victim, 'if you f*** with the pimping, I'm gonna crack your head' and threatening to 'slap the s***' out of another victim for not listening to him. He also bragged about knocking unconscious trafficking victims who disrespected him or other traffickers, including describing one instance in which he grabbed a woman by the throat, knocked her onto the sidewalk and then body slammed her for disrespecting another pimp along the Penn Track.  Welch struck a victim with a baseball bat for refusing to engage in prostitution after he directed her to do so, telling another sex trafficker that he wanted to leave a "stain on her brain.""

EDNY USAO Press Release, *Defendant Charged with Operating Sex-Trafficking Ring on Pennsylvania Avenue in Brooklyn Known As The "Penn Track"* (Oct. 17, 2023), at https://www.justice.gov/usao-edny/pr/defendant-charged-operating-sex-trafficking-ring-pennsylvania-avenue-brooklyn-known. In *United States v. McKenzie*, pending before this Court, the defendant is alleged to have impregnated a minor prostitute he employed, threatened to kill her two year old son, and after fleeing law enforcement, was found in a hotel with the minor whom he was pimping. 23-CR-500 (WFK), *see* ECF No. 22 at 7-8.

Two Penn Track defendants have been convicted at trial. In *United States v. Forney*, the defendant trafficked a fifteen-year-old girl, whom he had sex with, and showed another victim an image on his cellphone of a dismembered woman and stated, "this is what happens to whores who don't obey their pimps." 24-CR-146 (KAM), *see* EDNY USAO Press Release, *Defendant Convicted of Sex-Trafficking of Women at Notorious "Penn Track" in Brooklyn and the Coercion and Enticement of a Minor* (Aug. 15, 2025), at https://www.justice.gov/usao-edny/pr/defendant-convicted-sex-trafficking-women-notorious-penn-track-brooklyn-and-coercion. In *United States v. (Omari) Scott and Simmons*, Mr. Simmons admitted to murdering a rival pimp at the behest of Mr. Scott, after a sex worker left Mr. Scott to work under the rival. 24-CR-158 (KAM), *see* EDNY USAO Press Release, *Brooklyn Man Convicted of Committing Murder in the Course of Sex Trafficking at "Penn Track" in East New York, Brooklyn* (Jun. 9, 2025), at https://www.justice.gov/usao-edny/pr/brooklyn-man-convicted-committing-murder-course-sex-trafficking-penn-track-east-new. The murder followed an incident where Mr. Scott found Jane Doe 2 on the Penn Track, grabbed her by the hair, dragged her in the street and threw her into his car. *Id*.

## IV.    Mr. Dixon's Conditions of Confinement at MDC Brooklyn

Mr. Dixon acknowledges the harm he caused through his crimes. For nearly three years, though, he has endured conditions of confinement far more punishing than we have come to expect—and should expect—from the federal criminal justice system. They have taken a toll on him, on his mental health and physical safety, and on his ability to meaningfully rehabilitate, that is not justified by his offense conduct. MDC Brooklyn's problems are numerous; by now, they are well-known and beyond dispute. The facility is gravely understaffed, leading to persistent lockdowns. Violence has become commonplace, with two inmate murders during Mr. Dixon's incarceration, one of which he witnessed, as well as numerous drug overdoses. Staff corruption brings a regular supply of contraband, including cellular phones and drugs, into the units, increasing rates of discipline and contributing to violent conflict. As a result of these conditions, which are outside his control, Mr. Dixon has effectively served much of his pretrial detention in unwarranted SHU-like conditions.

"For years, the conditions in the federal jails that serve…the Eastern District of New York have been a major, growing, and widely understood problem." *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024). "Defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care." *Id*. "It has gotten to the point that it is routine for judges in both [the Southern] District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *Id*.

Prior to the pandemic, inmates who did not present disciplinary problems were permitted outside of their cells for the vast majority of the day—typically from 6:00am until the 4:00pm count, and then again from 4:30pm until 9:00pm. During that time, inmates could attend rehabilitative programming, engage in recreation, go to the law library to conduct legal research or review their discovery on computers, call their families, and so on. That all ended with the pandemic, and conditions have remained "modified," in MDC-parlance, for the ensuing five-plus years, including the entirety of the time Mr. Dixon has been incarcerated pretrial. Now, the MDC is routinely "locked down" for extended periods of time, during which inmates are all regularly confined to their 7.5 square meter double-bunked cells from 22 to 24 hours a day.

As is now well known, MDC Brooklyn has attributed these substandard conditions and challenges to staffing shortages. *See* Ex. H. "On a daily basis"—according to the officers themselves—"housing units at MDC Brooklyn are left vacated (unmanned by staff) and locked down." *Id*. at 1. The officers consider the conditions "inhumane to both staff and inmates." *Id*. at 2. "The agency as a whole has failed to assist MDC Brooklyn with the staffing crisis, hence allowing MDC Brooklyn to fail." *Id*. According to the government, as of November 2023— nearly a year into Mr. Dixon's time there—only 200 of 301 "authorized, non-supervisory correctional officer positions" at the MDC were filled and, of those 200 officers, thirty-four were either on extended leave or about to be transferred. Letter from the Government at 1-2, *Chavez*, 22-CR-303 (JMF) (S.D.N.Y Dec. 6, 2024), ECF No. 28. As Judge Furman calculated, this means that the MDC has been operating at only about 55% of its full CO staffing level, a historically

low percentage. *Chavez*, 2024 WL 50233, at *7. Lockdowns—effectively, solitary confinement—have become MDC's solution to every institutional problem, be it staffing shortages, searches for contraband (brought in by staff), or inmate violence (uncontrolled by staff). During lockdowns, family visits and calls cease without advance warning, or an end in sight; cold meals are delivered to cells, often well outside meal times; recreation and programming are wholly non-existent.

These lockdowns have persisted during Mr. Dixon's incarceration, which have impacted him directly. To describe just a few, in March 2023, the MDC ordered a lockdown in a failed effort to secure the facility from contraband cell phones and weapons. *See* Ex. I. In December 2023, the MDC ordered a lockdown after an inmate (not Mr. Dixon, of course) assaulted a staff member. *See* Dec. 2023 Mem. for Inmate Population from Captain Rodriguez, *United States v. Zeitlin*, 23-CR-419 (LAK) (S.D.N.Y. Jan 2. 2024), ECF No. 58-1. Inmates received a memo, *id.*, confirming a full lockdown for the entire facility—in the cell twenty-four hours a day, no calls, no visits—"until further notice," which continued for two straight weeks, including Christmas. The facility then softened the lockdown to permit a mere two hours a day out of the cell; this lasted for two days until another assault led to another full lockdown, until January 4, 2024. Detainees housed at the MDC during the same stretch as Mr. Dixon have tracked the time, *e.g.*, one defendant who kept a log of these lockdowns reported that he had been "locked down for 137 of [the] 245 days" he was detained there. Def.'s Sentencing Mem. at 7, *United States v. Jacobs*, 23-CR-413 (VB) (S.D.N.Y. Nov. 7, 2023), ECF No. 25. Lawyers in this office routinely receive emails announcing same-day and multi-day lockdowns, including from legal visits, or are advised of same upon arriving at the facility, including during Mr. Dixon's imprisonment on January 25, 2024; February 20-21, 2024; March 7, 2024; March 26-27, 2024; May 21-22, 2024; and June 7, 2024.

"Chaos reigns, along with uncontrolled violence." *United States v. Colucci*, 23-CR-417, 2024 WL 3643857, at *4 (E.D.N.Y. Aug. 5, 2024) (*citing United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024)). Throughout the facility, violence has risen, leaving Mr. Dixon traumatized and afraid. On June 23, 2023, during Mr. Dixon's incarceration, the Corrections Officer Union President warned the BOP, and the public, "The Local is trying to prevent loss of life and or serious physical harm to staff." Ex. H. "What are you waiting for, another loss of inmate life?" *Id*. She was unfortunately prescient. On July 17, 2024, yet another memo from the captain announced a full lockdown, again "until further notice," following what he called "an inmate death." *See* Ex. J. It was in fact an inmate murder, the second that summer. In *Colucci*, Judge Brown reviewed incidents of violence at the MDC during the spring and summer of 2024—all while Mr. Dixon has been incarcerated there:

> Each of the five months preceding this [August 2024] opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words. The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as yet-unidentified "brawls."

*Colucci*, 2024 WL 3643857 at *5.

In March 2024, an inmate was stabbed repeatedly in both arms, his abdomen, and his knee. *Id*. He received no medical care, but rather was placed in the SHU for 25 days. *Id*. In April 2024, an inmate was stabbed 44 times on his back, chest, abdomen, right arm, and leg. *United States v. Rivas*, 18-CR-398 (RPK), ECF No. 363. The attack was captured on video and released to the press. *Id*., *see* John Annise, *See it: Video From Inside Troubled Brooklyn Federal Jail Shows Brutal Gang Stabbing*, New York Daily News (July 27, 2024), *at* https://www.nydailynews.com/2024/07/27/see-it-video-from-inside-troubled-brooklyn-federal-jail-mdc-shows-brutal-gang-stabbing/. In May 2024, Christian Griffin alerted a corrections officer that he was in danger, and asked to be transferred to a different unit. *Griffin*, 2024 WL 2891686, at *1. The officer did nothing, and three inmates assaulted him, fracturing his orbital bone. *Id*. at *2. Doctors at the hospital recommended follow-up care, and possibly surgery; the MDC provided no medical care. *Id*. In June 2024, Uriel Whyte was murdered on his unit, fatally stabbed, reportedly over a within-MDC drug dispute. *Colucci*, 2024 WL 3643857 at *5. Just six weeks later, on July 17, 2024, Edwin Cordero was murdered, too. *Id*. at *6, *see* Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, The New York Times (July 17, 2024), *at* https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html. The facility remained locked down for nearly two months. Then, in November and December of 2024, Unit 62 erupted in gang violence, sending numerous inmates to the hospital as a result of "multiple serious assaults involving weapons, that have resulted in inmates sustaining serious injuries." Ex. K. Despite existing in this violent, out-of-control environment for nearly three years, Mr. Dixon has never committed an act of violence, even in self-defense.

Numerous judges in this district have documented severe medical neglect at MDC Brooklyn during the time Mr. Dixon has been incarcerated there. *See, e.g.*, Dec. 15, 2023 Hr'g Tr. at 3-6, 15, *United States v. Young*, 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023) (admonishing the MDC for repeatedly defying orders to transfer wheelchair-bound defendant with active MRSA infection to a medical facility); *United States v. Wise*, 23-CR-9 (DG), ECF No. 26 (MDC medical staff admission to "missing" CT results of mass on defendant's lung, causing it to more than double in size, and necessitating invasive cancer treatment); *United States v. Pickett*, 22-CR-486 (NRM), Dkt. Entry Sept. 16, 2024 (having ordered the government to investigate months of non-responded-to requests for medical treatment by another inmate who turned out to have cancer, Judge Morrison held that "neither the government nor the representatives from the Bureau of Prisons satisfactorily explained to the Court why the Bureau of Prisons repeatedly failed to treat defendant's complaints of excruciating pain, nor why he did not have access to medical providers who could competently assess and diagnose the cancerous growth in his leg until he was hospitalized in August 2024.").

Mr. Dixon suffered his own health scare while at the MDC. After being locked down for month after month, his freedom of movement and ability to exercise sharply curtailed, on March 12, 2025, Mr. Dixon was removed from MDC Brooklyn to the Brooklyn Hospital emergency room. His right calf had been steadily getting more swollen, which he continued to show a corrections officer day after day, who ignored him. By chance, a nurse eventually came to his unit, whom he flagged down, observed his knee, and sent him straight to the ER. He was

diagnosed with acute embolism and deep vein thrombosis of his leg, which had become perilously swollen. PSR ¶ 73. This is a life-threatening condition. *See* Mayo Clinic, *Deep vein thrombosis (DVT)* (Jun. 11, 2022), at https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557. Mr. Dixon was treated with blood thinners for six months, after which he was told he would return to the hospital for follow-up treatment; this never happened. Instead, when his leg resumed swelling, he pressed the panic button in his cell. The staff responded not by providing medical care but by sending him to the SHU. At the time of his hospitalization, Mr. Dixon was scheduled for surgery on his left shoulder following an injury at the jail. The surgery was placed on hold for at least the six-month course of blood thinners. Because of this delay, Mr. Dixon has experienced pain when he lifts his arm for a year and a half. These medical conditions cause anxiety and stress in addition to pain and suffering, as the MDC has earned no confidence in inmates (or their lawyers) that medical emergencies will be handled appropriately.

Incessant lockdowns, insufficient medical care, and the ever-present risk of violence are compounded by other systems failures. The facility is notorious for substandard facilities, ranging from the 2019 blackout and power outage that left inmates without light or heat for a week, to the MDC's spring 2024 admission of weevils or maggots in the food served to inmates. *See* Annie Correal and Joseph Goldstein, *'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse*, The New York Times (Feb. 9, 2019), at https://www.nytimes.com/2019/02/01/nyregion/mdc-brooklyn-jail-heat.html; John Annise, *Maggot-Infested Meals Being Served to Inmates at Brooklyn Federal Jail, Lawyers Say*, New York Daily News (Mar. 30, 2024), at https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/.

In sum, time served at MDC Brooklyn is "materially different than [time] served at a jail or prison elsewhere in the United States." *Colucci*, 2024 WL 3643857, at *7. While no mathematical formula can equate endless lockdown and threat of violence, or even death, with an appropriate multiplier, Mr. Dixon's qualitative experience shows that every day, week, and month he has served is significantly more challenging, less rehabilitative, and more severely punishing than we can or should reasonably expect from the federal prison system. These conditions, suffered for nearly three years, should play a role in determining how much more prison time is necessary here.

## V.    <u>Careful Consideration of the § 3553(a) Factors Warrant a Fifteen-Year Sentence</u>

Mr. Dixon's lifetime of trauma and abandonment from the moment of his birth help explain why he turned to the prostitution business as a road to misguided financial and emotional security. The comparably limited duration and minimal violence deployed through the four-day stretch of the instant offense offset, to at least some degree, the aggravating factor of the minor victim's age. His case is well within the heartland, and in some cases far less aggravated, than other defendants in this Circuit who have received fifteen-year sentences, or less. Justin Dixon is a redeemable person who is ready and willing to change his life. *See* Ex. B, Ex. L (letter of support). He feels genuine remorse for his actions and understands the deep harm he caused.

Taken together, a fifteen-year sentence meets all of the goals of sentencing. It is a severe one: thirty-three at the time of his arrest, Mr. Dixon will be approaching fifty at the conclusion of his sentence. His term of incarceration for an offense of this type will be dangerous. *See United States v. Adams*, 14-CR-650 (MKB) (JBW), ECF No. 123 at 11 ("In light of the circumstances of his crimes, fifteen years of incarceration will likely be extraordinarily hard for the defendant...as a convicted child sex offender, the defendant will probably be subjected to severe abuse from fellow inmates"). When he is released, it will be to a lengthy term of supervised release, in addition to all of the requirements of the sex offender registry. The decision Mr. Dixon made to allow this girl, at her request, to work for him will rightfully impact the rest of his entire life. We respectfully submit that fifteen years is sufficient, but not greater than necessary, to punish him.

Thank you for your consideration.

Respectfully submitted,

/s/

Mia Eisner-Grynberg, Esq.
Deputy Attorney-in-Charge
Eastern District of New York
(718) 330-1257

cc:    AUSA Lorena Michelen (by email and ECF)
       United States Probation Officer Nicole Gervase (by email)
       Justin Dixon (by mail)

# **<u>EXHIBIT A</u>**

# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

November 5, 2025

**Introduction**

I prepared this mitigation report to provide the Court with a comprehensive understanding of the life circumstances, developmental history, and current functioning of Mr. Justin Dixon. The purpose of this report is to contextualize the factors that have shaped Justin's life trajectory and to illuminate the psychological and environmental influences that contributed to his offending behavior.

A central theme emerging from Justin's history is the profound impact of abandonment and disrupted attachment. From birth, he experienced the absence of both parents and the instability of caregivers who struggled with addiction and adversity. These early experiences fostered a deep and enduring sense of insecurity and emotional deprivation that have shaped his behavior, relationships, and coping strategies throughout his life. His later struggles with impulsivity, poor judgement, and reliance on maladaptive means of achieving control and belonging can be understood within the context of chronic instability and unmet emotional needs.

Information presented in this report was gathered through a series of in-depth interviews conducted with Justin over the course of more than a year, collateral communication with his family members, and a review of available educational and medical records. While we fully acknowledge the seriousness of the current charges, this report seeks to offer a fuller understanding of the individual behind them—a man whose early experiences of loss and abandonment profoundly impaired his capacity for emotional regulation and healthy decision-making, yet who now demonstrates insight, remorse, and motivation for change.

The sections that follow detail Mr. Dixon's early home environment and family dynamics, the development of his behavioral and emotional functioning, and the compounding effects of trauma, loss, and environmental instability throughout his life. The report concludes with an assessment of his personal growth since incarceration, his demonstrated insight, and his potential for rehabilitation.

**Justin's Birth and Family Care Arrangements**

Justin Dixon was born at St. Mary's Hospital in Brooklyn, New York, on October 30th, 1990, to his mother, Latrinda Dixon, who was only 21 years old and struggling with addiction. According to family accounts, Ms. Dixon, unaware of the identity of Justin's father, gave birth alone and after delivering her son, left without him.

Shortly after Justin's birth, hospital staff discovered that he had been exposed to crack cocaine in utero—a tragic reflection of the chaos and instability surrounding his earliest moments of life. Overwhelmed by fear of legal and child welfare intervention, Ms. Dixon fled the hospital, abandoning her newborn son.

In an effort to spare Justin from entering the foster care system, his grandparents, who had already stepped in to raise his older half-sister, Kierra, once again answered the call. Despite their age and limited means, they welcomed Justin into their home, determined to give him safety and belonging.

**Early Family Instability and Caregiving Challenges**

Justin's grandparents, Gladis and Donald Dixon, were both retired and in their late sixties when they assumed full responsibility for him. They lived in a modest apartment in Bedford-Stuyvesant, Brooklyn, a home that was full of family but often marked by instability. In addition to Justin and his grandparents, his two uncles, aunt, and sister lived in the household, as well as his mother, whose presence fluctuated depending on her sobriety and personal circumstances.

Although his grandparents provided as much structure and care as they could, Justin's early environment was deeply affected by the pervasive substance use within his family. Kierra recalls the pain she and Justin felt when their mother would visit them while under the influence of drugs.

At approximately seven years old, Justin experienced a particularly distressing incident when his grandparents asked his mother to leave the home after stealing their engagement ring to support her addiction. He remembers standing beside his mother as she hastily collected her things into a garbage bag, tears streaming down his face as he tugged at her arm and begged her not to leave. The image of her walking away that day remains etched in his memory, marking one of the first moments he understood what it meant to lose someone he loved.

Addiction extended beyond his mother and permeated the broader family system inside the shared home. Justin's uncle Darryl, a military veteran, returned from the service struggling with heroin and alcohol dependence, and his aunt, Linda, battled alcohol abuse. The instability created by these dynamics, coupled with the strain on his aging grandparents, left Justin and his sister without the consistent emotional safety and structure essential to healthy development.

With his grandparents often preoccupied by crises related to their adult children's addictions, Justin and Kierra's needs were frequently overshadowed. As a result, Justin assumed responsibilities well beyond his years, recalling that by the first grade he was

walking to school alone, navigating his way through streets riddled with poverty, drugs, and violence.



[Justin in grade school]

From an early age, Justin's life was defined by exposure to addiction, loss and emotional chaos—circumstances that forced him to develop emotional defenses and shaped his behavioral development. Feelings of abandonment stemming from the absence of both parents often manifested as anger and mistrust.

**Early Behavioral and Emotional Difficulties**

Given the instability and emotional disruption that characterized his early environment, Justin began exhibiting behavioral difficulties at a young age. His sense of rejection and emotional neglect often surfaced as oppositional behavior and anger. With limited supervision and inconsistent caregiving, he struggled to regulate his emotions at home and in school. By third grade, Justin remembers teachers describing him as easily distracted and hyperactive, often acting out when he became frustrated or overwhelmed. School staff recommended an evaluation for attention-deficit/hyperactivity disorder (ADHD) and suggested Ritalin; however, his grandmother declined due to concerns about side effects. Without intervention, Justin's behavioral and emotional challenges persisted.

At home, his grandparents, though loving and well-intentioned, were aging and ill-equipped to manage behaviors rooted in trauma and unmet emotional needs. Ongoing family stress, addiction, and conflict left little capacity for consistent structure or emotional

containment. His outbursts were often managed through material appeasement—video games or new clothes—rather than emotional guidance or clear boundaries. Unlike his older sister, who faced stricter expectations due to gender norms, Justin was often left unsupervised and permitted to stay out late with friends, reinforcing his lack of structure and external control.

These early struggles are best understood within the framework of developmental trauma. Research in psychology and neuroscience consistently shows that children exposed to parental substance use, neglect, and inconsistent caregiving are at increased risk for emotional dysregulation.[1] In the absence of stable attachment figures, children often adopt survival-oriented coping mechanisms, such as defiance or withdrawal, that appear maladaptive in structured environments but reflect adaptation to chaos.[2] Justin's distrust of authority and difficulty managing frustration reflected these dynamics from an early age.

**Relocation and Family Loss**

At age ten, Justin relocated with his grandparents and sister to Goldsboro, North Carolina. His grandmother hoped the move would provide stability and distance from the family's ongoing struggles with addiction. The transition, however, was particularly difficult for Justin. He was deeply attached to his aunt Linda, who remained in New York and had been the most nurturing maternal figure in his life aside from his grandmother. In spite of her alcoholism, she treated Justin like the son she always wanted, and she gave him everything she had to see him happy. Her warmth met emotional needs that his grandmother, though protective, struggled to express. Verbal affection was rare in the home, leaving Justin with a persistent sense of emotional distance despite the care provided.

Shortly after the move, Justin's grandfather began experiencing frequent falls and was later diagnosed with peripheral artery disease. Following surgery, he developed a postoperative infection that led to his sudden death. For Justin, this was the loss of the only father figure he had ever known, reinforcing his early pattern of loss and deepening his emotional withdrawal and behavioral difficulties.

**Returning to New York**

When Justin was thirteen, his grandmother relocated the family back to New York, settling in Crown Heights, Brooklyn, where they were joined by his aunt Linda. Though he was

---

[1] Felitti VJ, Anda RF, Nordenberg D, Williamson DF, Spitz AM, Edwards V, Koss MP, Marks JS. Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. The Adverse Childhood Experiences (ACE) Study. Am J Prev Med. 1998 May;14(4):245-58. doi: 10.1016/s0749-3797(98)00017-8. PMID: 9635069.

[2] Perry, B. D. (2009). Examining Child Maltreatment Through a Neurodevelopmental Lens: Clinical Applications of the Neurosequential Model of Therapeutics. Journal of Loss and Trauma, 14(4), 240–255. https://doi.org/10.1080/15325020903004350

delighted to reunite with her, the environment they returned to was far more volatile, marked by gang activity, community violence, and pervasive crime. Community assessments in 2003 identified youth violence and gang activity as key safety concerns in Crown Heights, and local sources noted that the early and mid-2000s saw entrenched gang culture in the area.[3] For a youth already coping with trauma and minimal supervision, these conditions heightened his vulnerability to negative peer influences.

Justin's repeated relocations and ongoing losses left him eager for belonging. He gravitated towards peers involved in criminal activity and began spending time with an older cousin affiliated with a local gang. Exposure to gang culture normalized violence and reinforced the idea that toughness and street credibility equated to respect and safety. This environment led Justin to join a gang himself and begin using marijuana at age thirteen, reflecting the risk-taking and peer conformity often seen among trauma-exposed adolescents.[4]

Justin's first contact with the criminal legal system came in eighth grade, leading to a two-year juvenile detention placement and probation upon release in June 2006. Returning to the same unstable environment quickly reignited his prior patterns. Research consistently shows that youth incarceration often exacerbates risk-taking, disrupts development, and increases recidivism rather than fostering rehabilitation.[5]

After release, Justin briefly attended John Dewey High School in Brooklyn but became disengaged due to its pervasive gang culture and safety concerns. Feeling hopeless about his future and internalizing beliefs that people with his background could not succeed, Justin dropped out in tenth grade. This sense of futility reinforced his low self-esteem and drove his further involvement in high-risk behavior.

**Interpersonal Functioning and Attachment Patterns**

As Justin entered adulthood, the long-term effects of early trauma disrupted attachment, and limited support became increasingly apparent. He experienced recurrent legal involvement and difficulty sustaining stability in work or relationships. Although he originally pursued legitimate employment, impulse control issues, low frustration tolerance, and a need for immediate reinforcement undermined his efforts.

---

[3] Center for Court Innovation, Operation Data 2003: Community Perceptions of Quality of Life, Safety, Conflict, and Diversity in Crown Heights, Brooklyn (2003), https://www.innovatingjustice.org/wp-content/uploads/2004/07/chopdata1.pdf

[4] Tian L, Dong X, Xia D, Liu L, Wang D. Effect of peer presence on adolescents' risk-taking is moderated by individual self-esteem: An experimental study. Int J Psychol. 2020 Jun;55(3):373-379. doi: 10.1002/ijop.12611. Epub 2019 Jul 24. PMID: 31339180.

[5] Gilman, A. B., Walker, S. C., Vick, K., & Sanford, R. (2021). The Impact of Detention on Youth Outcomes: A Rapid Evidence Review. Crime & Delinquency, 67(11), 1792-1813. https://doi.org/10.1177/00111287211014141 (Original work published 2021)

Seeking a more stable and independent path, Justin used funds his aunt provided from a legal settlement she received to start his own small business. Drawing on his lifelong interest in cars, he began a car-washing service that gradually grew into a small car-rental service. For a time, this venture offered him a genuine sense of pride, purpose, and control over his life, something he had long struggled to achieve yet desperately wanted. However, the onset of the COVID-19 pandemic abruptly halted his business, erasing his progress and leaving him without financial stability or direction.

Feeling discouraged and perceiving few legitimate options, he gravitated toward peers who appeared successful through illicit means. For Justin, this lifestyle offered a sense of belonging, control, and identity—needs long unmet throughout his development. His actions reflected learned survival patterns rather than inherent criminal intent.

In 2018, Justin's world was further destabilized by the death of his aunt Linda, the person to whom he was closest. Her sudden passing left him devastated and emotionally adrift. Unable to process his grief, he turned to increased substance use, developing a dependence on codeine promethazine, alcohol, MDMA, and marijuana, as a means of numbing his emotional pain. His use during this period represented an attempt to self-medicate unresolved trauma rather than deliberate defiance.

Although he has no documented mental health treatment history in the community, Justin's lifelong exposure to instability, loss, and trauma likely contributed to unaddressed emotional dysregulation. The absence of early psychological intervention allowed these vulnerabilities to persist into adulthood.

**Current Circumstances and Motivation for Change**

Justin has been incarcerated at MDC Brooklyn for nearly three years, giving him ample time and space to reflect. Since his incarceration, Justin has demonstrated significant personal growth and increased emotional insight. When this writer first began working with him in August 2024, Justin appeared guarded and only partially aware of the factors shaping his behavior. Over the past year, however, he has shown meaningful progress, reflecting on his past, accepting accountability, and expressing genuine remorse. He sought, and successfully obtained, a transfer off of a gang-involved housing unit at the MDC. He has gradually shifted focus from his peer associations to his legal case and his education.

Despite the limited opportunities for self-development available at the MDC, Justin successfully enrolled in a competitive college course offered at the jail through Columbia University. From September 2024 to May 2025, he studied the American presidency and earned college credits for his participation.

He has also endured profound loss with the passing of his grandmother in November 2024, processing grief within the confinement of incarceration. During this period, Justin converted to Islam, describing his faith as a grounding force that instilled discipline, structure, and moral clarity.



[Justin's mother and grandmother]

The birth of his son has further deepened his motivation for change. Recognizing the intergenerational cycle of instability that marked his own life, Justin has expressed a determination to be present and supportive for his child. He views fatherhood as both a responsibility and an opportunity for redemption.

Justin accepts accountability for his crimes and is prepared to serve his sentence. His demonstrated insight, remorse, and commitment to change signal genuine rehabilitation. Continued access to therapeutic, educational, and faith-based programming will reinforce his growth and support long-term change.

**Sentencing Consideration**

Justin Dixon's life story reflects the cumulative effects of early trauma, instability, and loss. From birth, he was exposed to addiction, disrupted caregiving, and environmental upheaval, all of which profoundly shaped his development and decision-making. These experiences do not excuse his conduct but illuminate the vulnerabilities and maladaptive coping patterns that contributed to it.

During incarceration, Justin has engaged deeply in introspection, developed accountability, and shown sustained personal growth. The birth of his son has strengthened his resolve to

break the intergenerational cycle of absence and dysfunction that defined his upbringing. His progress demonstrates capacity for rehabilitation.

Accordingly, this writer respectfully recommends that his post-sentence reentry plan include ongoing case management support with the assistance of Federal Defenders social workers, access to vocational training, and consistent trauma-informed psychotherapy and substance abuse treatment. Addressing his substantial history of trauma is essential, not only for his personal healing, but to reduce the risks of recidivism to promote a sustainable path forward.

It is our hope that this report will allow the Court to see how Justin's history has shaped his present circumstances. Thank you for considering it.

Respectfully Submitted,

_____/s_____

Olivia Cahue-Diaz, LMSW
Mitigation Specialist
Federal Defenders of New York, Inc.

# **<u>EXHIBIT B</u>**

November 3, 2025

The Honorable William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kuntz,

My name is Justin Dixon and I have been incarcerated in MDC Brooklyn for 34 months. I have never in my 35 years of living been in prison for so long and I never would have imagined I would ever. I am a very friendly, sweet, optimistic, peaceful person. I always try to help others even when I'm not in a position to. I have a big heart, and I wear it on my sleeve. I've always thought that if there were more people in the world that try to help each other out it would be a better world. So, I don't let things spoil the way I think. I don't hold grudges, and I always stay positive.

Since I was young life has had many adversities and unspeakable anguish that you heard about in my PSR and mitigation report. Not having my father or knowing him, my mother on drugs, never there, also my family always being distant except my one aunt when she wasn't working all took a toll on me. Looking back on life, me not having enough led me to want acceptance from my peers to fill the void of attention I wasn't getting at home. That void put me on a pursuit of happiness that at many times I thought I wouldn't get because I tied it to monetary value. I thought money would buy me happiness, if I could be rich, I would be happy. My friends were more impoverished than I was and I would get in trouble for feeding them but in reality my family wasn't much better off.

I watched and learned from older guys in my neighborhood and started selling drugs. My friends liked to rob people, after I was arrested with them as a kid I never robbed anyone again. I hated juvie and I never wanted to be in jail again. I was making money selling drugs. I am a very ambitious person, if I don't know the answer to a question I will find it. I felt drugs were the way out of poverty at that time. I had limited clothes to wear with sneakers that were worn down, holes in them. So my survival instinct kicked in at an early age. As you get older you learned there is no action without a reaction. Patience, freedom, discretion, will, greed, are all things I needed to strengthen or remove from my life as I learned that there are things more important than money down the line. Fast money is more addictive than any drug.

Before my aunt died she received a large settlement from a lawsuit. She helped me open two businesses, one renting cars and one mobile car wash. When she passed she also left me a large amount. When she passed I went into a very depressed state. I have no problem working hard or making plans. Covid hit and I had shut down and lost a lot of the cars and fell behind on bills which built my desperation. That led me back to crime. I had

never prepared myself with financial literacy, so I was trying to buy happiness instead of stability. In jail now I have read a lot of books on that and books to build more wisdom, like "Mind is the Master" by James Allen and "The Prosperity Bible," and authors like Napoleon Hill, Benjamin Franklin, Wallace D. Wattles, Ernest Holmes, Florence Scovel Shinn and many others, I've read so many books.

I am very remorseful for accepting and encouraging women to prostitute. If my sister, mom, aunt, or grandmother was doing that I would want them to stop. Life is like a two-way mirror, I could only see the other side, but being incarcerated allowed me to see myself and the wrong position that I played. I let my money issues blind my better judgment. It was very wrong for me to see women that are in bad households, with parents on drugs, no food, or if they are homeless with nowhere to live and encourage them that being a prostitute is fast easy money. I am very sorry and accept responsibility for the charges. I hate myself for putting these women in danger because they were sleeping with strangers and I was influencing it. I take responsibility for what I did to their mental health after they slept with so many men. They might feel disgusted with themselves or have other mental issues. I am aware of the harm I caused them mentally. I am very sorry.

Thank you for reading this letter. I promise when I get out to stay out of trouble and find my son and make sure I'm there for him. I lost my grandmother while I was incarcerated. Even sadder is that I had to learn that from my lawyer. When I was home I was taking care of my grandmother, I used to be there for my mother, she still uses drugs and she uses more now that I'm not there. My uncle is in a nursing home because I am not there to help him. Losing my grandmother, my uncle in the nursing home, my mom using drugs at the rate she is, it all weighs so much on my mind because I feel its all worse because I wasn't there. Besides the maggots in food, bugs in food, mattresses the width of your pinky, mold in the showers, so many months added due to short staff or staff just not coming or overworked staff, lack of commissary, multiple deaths in this jail, numerous stabbings and cuttings, inmates being raped, I still hurt more for my son because I grew up without my father. I will learn any trade I can to secure a job when I get out. I just want to get back to my family as soon as possible please.

Thank you very much.

Sincerely,
Justin Dixon

# **EXHIBIT C**

COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK

5/5/2025

To whom it may concern:

I write in my capacity as a history professor at Columbia University teaching political science at MDC Brooklyn.

Justin Dixon has participated in 'The US Presidency: From Washington to Trump" class since September of 2024.

This lecture examines how the American presidency evolved into the most important job on earth. It examines how major events in US and world history shaped the presidency. How changes in technology and media augmented the power of the president and how the individuals who served in the office left their marks on the presidency. Each class will make connections between past presidents and the current events involving today's Commander-in-Chief. Some topics to be discussed: Presidency in the Age of Jackson; Teddy Roosevelt and Presidential Image Making; Presidency in the Roaring '20s; FDR and the New Deal; Kennedy and the Television Age; The Great Society and the Rise of the New Right; 1968: Apocalyptic Election; The Strange Career of Richard Nixon; Reagan's Post Modern Presidency; From Monica to The War on Terror. We practice close reading, group work, and philosophical analyses. We thereby inspire each other to become more thoughtful and compassionate community members. Graduates of our class receive Columbia University credit and a certificate as recognition for their success.

Our courses promote reading comprehension, persuasive writing, and creative thinking. By discussing some of the most challenging times in US History, we provoke reflections on profound philosophical questions like the role of citizenship and suffering in life, the nature of justice and wisdom, and the tension between fate and free will. Students are encouraged to debate their ideas in class, and we require them to compose and submit essays in order to pass the course.

I encourage students to pursue advanced degrees. We strongly believe that our program, with its emphasis on critical thinking skills, creativity, and collaboration, was integral to these successes.

David Eisenbach
Lecturer
Columbia University

# Certificate of Completion





## COLUMBIA UNIVERSITY
### IN THE CITY OF NEW YORK

*Justin Dixon*

*has successfully completed a mid-term*

*The Presidents: From Washington to Trump*

*offered by Columbia University*

*and in testimony thereof is awarded this*

## Certificate of Completion

*Conferred in the City of New York on this*

*Thirteenth Day of May in the year Two Thousand Twenty-Five.*

_____
David Eisenbach, Columbia University



## U.S. Department of Justice
### Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Justin Dixon*

**Commercial Driver's License Test Prep Class**

*Adult Continuing Education Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
May 26, 2023



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Justin Dixon*

**Habitat for Humanity How to Build a House**
*Adult Continuing Education Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**June 2, 2023**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Justin Dixon*

**Sales Fundamentals**

*Corporate Skills Education Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**June 2, 2023**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Jason Dixon*

**Developing Creativity**
*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**June 2, 2023**



# Certificate of Completion

**U.S. Department of Justice**
Federal Bureau of Prisons

This certificate is presented to

*Justin Dixon*

**Leadership & Influence**
*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**June 6, 2023**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Justin Dixon*

**The Ten Soft Skills You Need**
*Corporate Skills Training Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
June 15, 2023



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Justin Dixon*

**Business Acumen**

*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**June 19, 2023**



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Justin Dixon*

**Your Money Values and Influences**

*Money is either a good or bad influence, according to the character of the person who possesses it.*

*J. Murray*

J. Murray - Teacher

**August 21 , 2024**



# MDC Brooklyn
# Recreation Department

This is to Certify that

## Justin Dixon

Has Successfully Completed

## Recreation & Leisure Sentry Class

At MDC Brooklyn

This certificate is hereby issued this 3rd Day of September, 2024

*J. White*

Recreation Specialist

# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Achievement

We present this certificate to

## JUSTIN DIXON

**START NOW: MY FOUNDATION-UNIT 1**
"The greatest achievement is to outperform yourself."
— Denis Waitley

*C. Emile*
Mrs. C. Emile - Teacher
November 13, 2024



*M. John Pierre*
Mrs. M. John-Pierre – Supervisor of Education
Metropolitan Detention Center





**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Justin Dixon*

**You Can Bank On It**

"Banking is very good business if you don't do anything dumb." – Warren Buffett

*J. Murray*

**J. Murray - Teacher**
**November 13, 2024**

# CERTIFICATE
## of Completion
### Stress-Management Course

This certifies that

## Justin Dixon

Has successfully completed the four day Stress-Management Course
sponsored by the International Association for Human Values.
The participant has achieved all requirements to complete the program.



P.Okin / E.Rostkowski

**INSTRUCTOR**

*J. Wright*

**NOVEMBER 18-21, 2024**

**MDC BROOKLYN**

**LOCATION**



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Justin Dixon*

**COMMERCIAL CLEANING BUISNESS COURSE**

*Adult Continuing Education / Recreation Curriculum*

A. DeVastey – Education Technician
December 01st, 2024



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Justin Dixon*

**Your Spending and Saving Plan**

True wealth comes from financial independence and contentment with what you have, rather than constantly chasing more.

*J. Murray*

J. Murray - Teacher

December 18, 2024



# MDC Brooklyn
# Recreation Department

DEPARTMENT OF JUSTICE

This is to Certify that

*Justin Dixonce*

Has Successfully Completed

**STRUCTURED ACTIVITY**

**CIRCUIT TRAINING**

FEDERAL BUREAU MDC Brooklyn

This certificate is hereby issued this 31st day of January 2025

*J. White*

Recreation Specialist



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate

*Justin Dixon*

**Your Savings**

"A budget is telling your money where to go instead of wondering where it went." — John C. Maxwell

*J. Murray*

J. Murray - Teacher
**March 18, 2025**



# Certificate of Completion

This certifies that

## JUSTIN DIXON

completed the following program:

# The National Parenting Program: Phase One



G. Matey, Special Population Coordinator

MDC BROOKLYN

07/21/25

DATE

# **EXHIBIT D**
# **Filed Under Seal**

# **EXHIBIT E**
# **Filed Under Seal**

# EXHIBIT F
# Filed Under Seal

# **EXHIBIT G**

**DIXON, Justin (id #22314808, dob: 10/30/1990)**
**Encounter Date: 01/26/2023**
Patient

| Name | DIXON, JUSTIN (32yo, M) ID# 22314808 | Appt. Date/Time | 01/26/2023 11:45AM |
|---|---|---|---|
| DOB | 10/30/1990 | Service Dept. | CMDNY_ Richmond |
| Provider | STEVEN HARTSTEIN PA | | |
| Insurance | Med Primary: METROPLUS HEALTH PLAN (MEDICAID REPLACEMENT - HMO) Insurance # : WU68019T Prescription: CVS|CAREMARK - Member is eligible. details | | |

## Chief Complaint

,COVID - Visit/Testing, ,,Urgent Care*

## Patient's Care Team

**Notes:** NO PCP

## Patient's Pharmacies

**CVS/PHARMACY #6054 (ERX): 2465 RICHMOND AVE., STATEN ISLAND, NY 10314, Ph (718) 370-0365, Fax (718) 370-1458**
CVS/PHARMACY #6048 (ERX): 1933 VICTORY BLVD, STATEN ISLAND, NY 10314, Ph (718) 447-0300, Fax (718) 448-8146

## Vitals

| | | |
|---|---|---|
| **Ht:** 5 ft 9 in (175.26 cm) 01/26/2023 11:52 am | **Wt:** 165 lbs (74.84 kg) 01/26/2023 11:53 am | **BP:** 130/86 01/26/2023 11:57 am |
| **Pulse:** 85 bpm 01/26/2023 11:57 am | **T:** 100.1 F° (37.83 C) 01/26/2023 11:57 am | **RR:** 16 01/26/2023 11:52 am |
| **O2Sat:** 96% 01/26/2023 11:57 am | **BMI:** 24.4 01/26/2023 11:53 am | |

## Allergies

Reviewed Allergies

NKDA

## Medications

Reviewed Medications

| **amoxicillin 875 mg tablet** Take 1 tablet(s) twice a day by oral route for 10 days. **Internal Note:** DO NOT FILL THIS Rx. This is a wait and see prescription. Pt will fill Rx ONLY if needed. Rx expires 14 days after issue. **Note:** DO NOT FILL THIS Rx. This is a wait and see prescription. Pt will fill Rx ONLY if needed. Rx expires 14 days after issue. | 01/26/23 | prescribed |
|---|---|---|
| **benzonatate 100 mg capsule** Take 1 capsule(s) 3 times a day by oral route as needed for 7 days. | 01/26/23 | prescribed |

## Problems

Reviewed Problems
No known problems

## Family History

Reviewed Family History

| Father | - No current problems or disability |
|---|---|
| Mother | - No current problems or disability |

## Social History

Reviewed Social History
**Substance Use**

SUMMIT CITYMD NY • 1243 FULTON ST, BROOKLYN NY 11216-2004

**DIXON, Justin (id #22314808, dob: 10/30/1990)**
Do you have you ever smoked tobacco?: Current every day smoker
What was the date of your most recent tobacco screening?: 01/26/2023
Has tobacco cessation counseling been provided?: Yes
On what date was tobacco cessation counseling provided?: 01/26/2023
**Segmentation**
RISK LEVEL - Segmentation: Level 1 - Healthy

## Surgical History

Reviewed Surgical History

## Screening

None recorded.

## HPI

**COVID-19 VISIT - cmd**
    Reported by patient.

Patient presents for **COVID-19 VISIT**
Pertinent findings: No fever; No CP; No leg swelling; No neurologic deficits; No SOB; denies any significant comorbidities**(+) body aches; (+) sore throat; (+) nasal discharge/congestion; (+) cough**
COVID vaccination status: **(+) COVID Vaccination and HAS been > 2 weeks since the FINAL scheduled dose**
Notes:
Pt reports symptoms x 7 days. Pt requesting abx.

## ROS

**Additionally reports:**
**I, the undersigned clinician, attest the documentation accurately reflects my words and actions rendered at this patient's visit. Ancillary tests performed during visit were done so by me or Auxiliary personnel under my Direct Supervision. Documentation/scribing this patient's chart performed by scribe.**

**Case d/w pt at length including risks vs benefits of the different management/treatment options as well as any alternatives. Pt instructed to RTO for re-evaluation or f/u with PCP should sxs persist. Pt advised to go to the ER should sxs worsen. Pt advised to call should there be any further questions. Pt verbalizes an understanding & agreement with the plan as discussed.**
**- Provider wore N95 Mask during encounter (and full PPE (gown, gloves, face shield) when applicable). Support staff wore N95 Mask throughout entire patient encounter (+ gown & gloves when applicable).**
**- Accuracy of Rapid SARS - CoV -2 antigen test and confirmatory testing options discussed with patient.**
**- For patients with symptoms consistent with Covid-19 who received a negative Rapid COVID test, recommended additional PCR testing.**
**- Pt advised that all send-out test results will be communicated through CityMD's patient portal. Pt will receive a text message or email with a link when results are back.**
**- Discussed with patient (And/or parent/guardian/partner/family member) signs and symptoms of Covid-19, potential for worsening condition and need to be immediately re-evaluated for worsening symptoms or new symptoms not previously present.**
**- Discussed most up-to-date quarantine guidelines for patients with known high-risk exposure, and/or recent return from travel from region with known high prevalence on the NYS/NJ travel quarantine list and/or patients with symptoms consistent with Covid-19 or with a positive Covid-19 test**
**- If performed antibody testing - discussed with patient that the presence of antibodies does not necessarily infer immunity to the SARS-COV2 virus. Discussed limitations of antibody testing, including false negatives, false positives (exposure to different coronavirus), and the inability to ascertain whether or not the presence of antibodies confers immunity to the SARS-COV2 virus.**
**- If performed PCR testing - discussed limitations of PCR test, including false negatives, false positives, and the results of tests cannot be used to determine contagion status of patient. Pt was advised that regardless of results of the tests, all social distancing practices need to be adhered to.**

/

/

**Abx sent per pt request pending positive throat culture.**

**Provider wore full PPE equipment (N95, gown, gloves, face shield) and Scribe wore N95 throughout entire patient encounter**

**Quarantine advised.**

**Denies n/v/cp/current sob/rash/abdominal pain. The pt reports tolerating PO solids and liquids well without difficulty. No hemoptysis, no recent travel/immobilization. Pt in NAD, appears healthy, speaking in full sentences without difficulty, ambulating unassisted. No abdominal tenderness/mass, no peripheral edema, lungs CTAB, no visible rash/erythema. Hydration techniques advised. OTC tylenol and antitussive prn discussed. Abx side effect potential discussed, including but not limited to c.dif, anaphylaxis, allergic reaction, dysrhythmia risk. ER precautions advised for new or worsening**

SUMMIT CITYMD NY • 1243 FULTON ST, BROOKLYN NY 11216-2004

### DIXON, Justin (id #22314808, dob: 10/30/1990)

symptoms. Follow up with PCP asap. The patient verbally endorses understanding and agreement with the plan.

## Physical Exam

**Constitutional:** General appearance: looks well and no acute distress. Ambulation: ambulating normally (**unassisted**).

**Eyes:** RIGHT eye: Conjunctiva and Lid NO lid swelling and erythema and NO injection and discharge. LEFT eye: Conjuctiva and Lid NO lid swelling and erythema and NO injection and discharge. Sclerae: NO icterus. Pupils PERRL. EOM: EOMI.

**Ear / Nose / Throat:** Oropharynx NO erythema, exudate, sores / lesions, tonsillar swelling, swelling posterior pharynx or tongue, drooling, stridor, or muffled voice, and uvular edema and uvula midline. RIGHT Ear: NO loss of hearing. LEFT Ear: NO loss of hearing. External Ear: NO erythema and swelling. Sinus: NO sinus tenderness. Nose: NO turbinate swelling and nasal discharge.

**Lungs:** Auscultation: NO wheezing, rales or crackles, and rhonchi or coarse BS and breath sounds normal and good air movement. Respiratory effort: Normal respiration effort and speaking in Full Sentences.

**Cardiovascular System:** Heart Auscultation: RRR, Normal S1, S2 heart sounds, and No murmurs, rubs or gallops.

**Abdomen / GI:** ABDOMEN NO tenderness and guarding or rebound and soft, normal bowel sounds, and No flank tenderness.

**Skin:** SKIN: NO rash (**no rash/lesion on visible skin regions. Skin intact**).

**Psychiatric:** Psychiatric Alert & Oriented x 3 and judgement and insight intact.

**Neurologic:** NEUROLOGIC alert and oriented x 3, gait normal, and Speech normal; **No obvious cranial nerve deficits.**

**MSK - Right LOWER extremity:** Right LOWER LEG **no peripheral edema**.

**MSK - Left LOWER extremity:** Left LOWER LEG **no peripheral edema**.

## Assessment / Plan

**1. Exposure to SARS-CoV-2**
Z20.822: Contact with and (suspected) exposure to COVID-19
- A HEALTHY LIFESTYLE: CARE INSTRUCTIONS
- RAPID SARS COV 2 AG, QL IA, RESPIRATORY SPECIMEN
- RAPID FLU (A+B)

**2. Pain in throat**
R07.0: Pain in throat
- SORE THROAT: CARE INSTRUCTIONS
- RAPID STREP GROUP A, THROAT
- CULTURE THROAT (STREP) -ID CMD

 Is patient allergic to penicillin?: N

- amoxicillin 875 mg tablet - Take 1 tablet(s) twice a day by oral route for 10 days.    Qty: (20)  tablet    Refills: 0    Pharmacy: CVS/PHARMACY #6054    Note to Pharmacy: DO NOT FILL THIS Rx. This is a wait and see prescription. Pt will fill Rx ONLY if needed. Rx expires 14 days after issue.

**3. Cough**
R05.9: Cough, unspecified
- benzonatate 100 mg capsule - Take 1 capsule(s) 3 times a day by oral route as needed for 7 days.    Qty: (20)  capsule    Refills: 0    Pharmacy: CVS/PHARMACY #6054

RAPID SARS COV 2 AG, QL IA, RESPIRATORY SPECIMEN
- Result:
    - **Rapid COVID-19 Antigen (Internal Control Positive): Negative**

RAPID STREP GROUP A, THROAT
- Result:
    - **Group A Strep / internal control positive: NEGATIVE (internal control positive)**

RAPID FLU (A+B)
- Results:
    - **Flu B (control pos): NEGATIVE**
    - **Flu A (control pos): NEGATIVE**

**Patient Instructions**
    Thank you for visiting CityMD. There are two ways to view your lab results:

    1.  The **My Summit Health** app is available to all patients 18 and older in the App Store and Google Play. First-time app users will need to create an account; please note you'll need to select a login and password for the app versus just using your patient portal login credentials. Your lab results will be posted to the My Summit Health app as soon as they're available.
    2.  Via **email**, as soon as lab results are available. If you don't receive an email within the estimated time frame, give our

SUMMIT CITYMD NY • 1243 FULTON ST, BROOKLYN NY 11216-2004

**DIXON, Justin (id #22314808, dob: 10/30/1990)**
Aftercare team a call at 855-624-8963.

--------------------------------------------------------------------------------------------------------------

Test Name: **SARS-CoV-2 rapid ag (COVID-19);**

Result: **NEGATIVE**

Your test today for COVID-19 infection was**NEGATIVE.** The next steps in your care depend on your whether you are having symptoms or had an exposure to Covid-19:

NOTE: an EXPOSURE is defined as spending more than 10 minutes (within a 24 period) within an enclosed space with an individual who tested positive for Covid-19

If NO EXPOSURE to COVID-19:

**If you are ASYMPTOMATIC and NO KNOWN EXPOSURE:**You are cleared to go back to work or school since you have no symptoms suggestive of COVID-19, have not had a high risk exposure to a person known to have COVID-19, and your Rapid Covid Test result is negative.

**If you have SYMPTOMS with NO KNOWN EXPOSURE to COVID-19:**Your medical provider may have sent a second test to an outside lab to confirm that today s test was truly negative. The results of this second test (PCR technique) will be published to your CityMD patient portal (portal.citymd.com) as soon as they are available (3-5 days on average). For now, we ask that you go home under strict QUARANTINE, monitor for any worsening symptoms and return for re-evaluation if your symptoms become severe.

If HIGH-RISK EXPOSURE:

**FULLY VACCINATED:** If you are fully vaccinated and boosted (with the booster at least 2 weeks before the first date of exposure) or you are not yet eligible for a booster, NO QUARANTINE IS REQUIRED. You should wear a well-fitting mask while aroundothers for 10 days after the last date of exposure.

**NOT FULLY VACCINATED** (including vaccinated and eligible for a booster but not yet boosted): You should QUARANTINE for 5 DAYS, then wear a well-fitting mask while around others for an additional 5 days.

It is recommended that you **TEST at DAY 5** if possible (either PCR or Rapid Antigen)

If you **DEVELOP SYMPTOMS:** QUARANTINE and SEEK TESTING. In this situation, quarantine would end when the test is negative. If testing is not done, isolate according to the guidance above (Vaccinated vs NOT-Vaccinated).

Be Safe

**MONITOR YOUR SYMPTOMS:** If at any point your symptoms become worse or severe such as fever that will not improve with medicine, shortness of breath, chest pain or discomfort, abdominal pain, inability to tolerate eating and drinking, please return to CityMD or go to the closest Emergency Room.

**QUARANTINE INFO:** If you were asked to quarantine yourself, please stay in your own part of the house away from everyone else, using your own bedroom and bathroom, if possible. If you need to be in a common area ensure that both you and anyone else around you is wearing a mask.You will be considered free of contagious COVID-19 10 days after your symptoms began – if your symptoms have significantly improved and you have not had a fever for at least 24 hours (without using fever reducing medications like acetaminophen or ibuprofen).

**Please continue to follow all personal safety practices when outside the home, including (a) wearing a nose and mouth covering at all times when around people outside of your household, (b) social distancing, (c) hand hygiene, and (d) avoidance of contact with people with known or possible COVID-19.**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Pharyngitis
Your Care Instructions
Infection by bacteria or a virus causes most sore throats. Cigarette smoke, dry air, air pollution, allergies, and yelling can also cause a sore throat. Sore throats can be painful and annoying. Fortunately, most sore throats go away on their own. If you have a bacterial infection, your doctor may prescribe antibiotics.
Follow-up care is a key part of your treatment and safety. Be sure to make and go to all appointments, and call your doctor if you are having problems. It"s also a good idea to know your test results and keep a list of the medicines you take.
How can you care for yourself at home?
If your doctor prescribed antibiotics, take them as directed. Do not stop taking them just because you feel better. You need to take the full course of antibiotics.
Gargle with warm salt water once an hour to help reduce swelling and relieve discomfort. Use 1 teaspoon of salt mixed in 1 cup of warm water.
Take an over-the-counter pain medicine, such as acetaminophen (Tylenol), ibuprofen (Advil, Motrin), or naproxen (Aleve). Read and follow all instructions on the label.
Be careful when taking over-the-counter cold or flu medicines and Tylenol at the same time. Many of these medicines have acetaminophen, which is Tylenol. Read the labels to make sure that you are not taking more than the recommended dose. Too

**DIXON, Justin (id #22314808, dob: 10/30/1990)**

much acetaminophen (Tylenol) can be harmful.
Drink plenty of fluids. Fluids may help soothe an irritated throat. Hot fluids, such as tea or soup, may help decrease throat pain.
Use over-the-counter throat lozenges to soothe pain. Regular cough drops or hard candy may also help. These should not be given to young children because of the risk of choking.
Do not smoke or allow others to smoke around you. If you need help quitting, talk to your doctor about stop-smoking programs and medicines. These can increase your chances of quitting for good.
Use a vaporizer or humidifier to add moisture to your bedroom. Follow the directions for cleaning the machine.
When should you call for help?
Call your doctor now or seek immediate medical care if:
You have new or worse trouble swallowing.
Your sore throat gets much worse on one side.
Watch closely for changes in your health, and be sure to contact your doctor if you do not get better as expected.
***********************************

**Cough**
Your Care Instructions:
A cough is your body's response to something that bothers your throat or airways. Many things can cause a cough. You might cough because of a cold or the flu, bronchitis, or asthma. Smoking, postnasal drip, allergies, and stomach acid that backs up into your throat also can cause coughs.
A cough is a symptom, not a disease. Most coughs stop when the cause, such as a cold, goes away. You can take a few steps at home to cough less and feel better.
Follow-up care is a key part of your treatment and safety. Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.
How can you care for yourself at home?
Drink lots of water and other fluids. This helps thin the mucus and soothes a dry or sore throat. Honey or lemon juice in hot water or tea may ease a dry cough.
Take cough medicine as directed by your doctor.
Prop up your head on pillows to help you breathe and ease a dry cough.
Try cough drops to soothe a dry or sore throat. Cough drops don't stop a cough. Medicine-flavored cough drops are no better than candy-flavored drops or hard candy.
Do not smoke. Avoid secondhand smoke. If you need help quitting, talk to your doctor about stop-smoking programs and medicines. These can increase your chances of quitting for good.
When should you call for help?
Call 911 anytime you think you may need emergency care. For example, call if:
You have severe trouble breathing.
Call your doctor now or seek immediate medical care if:
You cough up blood.
You have new or worse trouble breathing.
You have a new or higher fever.
You have a new rash.
Watch closely for changes in your health, and be sure to contact your doctor if:
You cough more deeply or more often, especially if you notice more mucus or a change in the color of your mucus.
You have new symptoms, such as a sore throat, an earache, or sinus pain.
You do not get better as expected.

Return to Office
Patient will return to the office as needed.

Encounter Sign-Off
Encounter signed-off by Steven Hartstein PA, 01/26/2023.

Encounter performed by Steven Hartstein PA
Encounter scribed for Steven Hartstein PA by Sabrina Gheller
Encounter signed by Sabrina Gheller as scribe at 01/26/2023 at 12:16pm
Encounter reviewed & signed by Steven Hartstein PA on 01/26/2023 at 1:25pm

# Lab Results

SUMMIT CITYMD NY • 1243 FULTON ST, BROOKLYN NY 11216-2004

**DIXON, Justin (id #22314808, dob: 10/30/1990)**

## CULTURE THROAT (STREP) -ID CMD 01/30/2023 (#264420646, Final, 01/26/2023 12:50pm)

| Ordering Provider | STEVEN HARTSTEIN PA | Performing Lab | Z99, QUEST DIAGNOSTICS-CLIFTON, 1 INSIGHTS DRIVE, CLIFTON, NJ, 07012-2355 |
|---|---|---|---|
| Specimen/Accession ID | B23026836ET | Specimen Source | THROAT SWAB |
| Specimen Coll. Date | 01/26/2023 12:50 | Result Status | Final |
| Specimen Rec. Date | 01/27/2023 02:48 | Report Status | |
| Specimen Reported Date | 01/30/2023 01:19 | | |

| Report | Result | Ref. Range | Units | ⚠ | | Status | Lab |
|---|---|---|---|---|---|---|---|
| **CULTURE, THROAT** | SEE NOTE | | | **ABNORMAL** | | **Final** | **QUEST** |
| | CULTURE, THROAT<br><br>Micro Number:     15499170<br>Test Status:      Final<br>Specimen Source:  Throat<br>Specimen Quality: Adequate<br>Result:          Scant growth of Group G Streptococcus<br>                  Beta-hemolytic streptococci are predictably<br>                  susceptible to Penicillin and other beta-lactams.<br>                  Susceptibility testing not routinely performed.<br>                  Please contact the laboratory within 3 days if<br>                  susceptibility testing is desired. | | | | | | |
| RESULT NOTE | Quest Accession #: CF876352M<br>Quest Results Received Date/Time: 20230127025900<br>Quest Reported Date/Time: 20230130011900 | | | | | | |

## RAPID STREP GROUP A, THROAT 01/26/2023 (#263817453, 01/26/2023 12:18pm)

| Report | Result | Ref. Range | Units | ⚠ | Status | Lab |
|---|---|---|---|---|---|---|
| Group A Strep / internal control positive | NEGATIVE (internal control positive) | | | | | |

## RAPID FLU (A+B) 01/26/2023 (#263817519, 01/26/2023 12:18pm)

| Report | Result | Ref. Range | Units | ⚠ | Status | Lab |
|---|---|---|---|---|---|---|
| Flu A (control pos) | NEGATIVE | | | | | |
| Flu B (control pos) | NEGATIVE | | | | | |

## RAPID SARS COV 2 AG, QL IA, RESPIRATORY SPECIMEN 01/26/2023
(#263816180, 01/26/2023 12:13pm)

| Report | Result | Ref. Range | Units | ⚠ | Status | Lab |
|---|---|---|---|---|---|---|
| Rapid COVID-19 Antigen (Internal Control Positive) | Negative | | | | | |

## Vaccination Records

**DIXON, Justin (id #22314808, dob: 10/30/1990)**

```
Evaluated Immunization History
- Vaccine Group: OPV
- Date Administered: 05/22/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: OPV
- Date Administered: 03/20/1993
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: OPV
- Date Administered: 04/04/1995
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: HEP B LT20 YRS (ENGERIX, RECOMBIVAX)
- Date Administered: 03/20/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: HEP B LT20 YRS (ENGERIX, RECOMBIVAX)
- Date Administered: 04/04/1995
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: HEP B LT20 YRS (ENGERIX, RECOMBIVAX)
- Date Administered: 08/01/1995
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: MMR
- Date Administered: 09/04/1991
- Valid Dose: N
- Validity Reason: 1001
- Completion Status: CP
- Vaccine Group: DTP
- Date Administered: 03/20/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: DTP
- Date Administered: 05/22/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: DTP
- Date Administered: 09/04/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: DTP
- Date Administered: 03/23/1993
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: HIB NOS
- Date Administered: 03/20/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: HIB NOS
- Date Administered: 05/22/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: HIB NOS
- Date Administered: 09/04/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: OPV
```

SUMMIT CITYMD NY • 1243 FULTON ST, BROOKLYN NY 11216-2004

**DIXON, Justin (id #22314808, dob: 10/30/1990)**
- Date Administered: 03/20/1991
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: DTP
- Date Administered: 04/04/1995
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP
- Vaccine Group: MMR
- Date Administered: 01/13/1997
- Valid Dose: Y
- Validity Reason:
- Completion Status: CP

Vaccine Schedule used: ACIP

# **EXHIBIT H**




# AFGE Local 2005
## Council of Prison Locals #33, AFL-CIO
100 29th Street
Brooklyn, New York 11232

---

DATE: June 23, 2023

MEMORANDUM FOR: AMY BONCHER, REGIONAL DIRECTOR

FROM: Rhonda Barnwell, President, AFGE Local 2005 President/ *Rhonda Barnwell*

SUBJECT: Unsafe Working Conditions


The Local has tried diligently to resolve this issue at the local level numerous times and have been unsuccessful at every attempt. Though this is an ongoing issue, and multiple Bureau of Prisons Institutions, it creates a higher risk for staff and inmates alike within a high rise/Detention Center setting. As you are aware MDC Brooklyn maintains various levels of inmate offenders, all while continuously receiving large volumes of in-transit inmates and new commits daily, as well as court appearances and Escorted Hospital trips. The demands of a high transit Institution with little to no staff is a violation of Article 27 of the Master Agreement.

For a multitude of reasons, MDC Brooklyn is and has been severely understaffed for years. The current turnover rate for incoming/new Officers is over 50%, and will continue to decline if the Northeast Region and or the Director continues to turn a blind eye to what is actually happening in New York City, as we can not compete with the pay band of other agencies within the Tri-state area.

On a daily basis housing units at MDC Brooklyn are left vacated (unmanned by staff) and locked down, with the expectation of Management that a single (One) Officer is to make rounds, feed, and perform additional correctional duties on the vacated units. Additionally, visiting room staff are required to perform the duties of additional officers because the agency refuses to cease legal and social visits when there are no staff. The Local is trying to prevent loss of life and or serious physical harm to staff. Lest I remind you of the serious staff assault that took place here at MDC Brooklyn around February 2022, in which Officer A. Flores was physically assaulted by an inmate, who punched him in the mouth

and attempted to drag him down the housing unit stars via his stab proof vest. As a result of the assault, Mr. Flores had to have jaw reconstruction surgery and eventually quit the BOP because of the safety concerns and him not feeling supported by the Agency.

During previous LMR Meetings, institution management was made aware of the Local's concerns regarding this change in the employees' working conditions, to which Management's stated "staff would not be held accountable if there was an assault and or loss of life during these times". This is unacceptable as Management at the local level are aware of the potential hazards associated with requiring one officer to maintain 3 housing units in a single shift, all while being mandated with little to no sleep. This is a violation of the Collective Bargaining Agreement and Program Statement 3000.03. Do you consider this a safe practice? Would you want to work under these conditions?

The Agency's actions are inhumane to both staff and inmates, as the institution remains locked down on several occasions, which angers the inmates and heightens the inherent danger for staff. Coverage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and or inmate medical emergencies. This is especially true on weekends and holidays and there is no longer any TDY staff to assist with this burden.

In accordance with Article 27 of the Master Agreement; the Employer agrees to lower those inherent hazards to the lowest possible level; the employer also agrees to furnish employee's places and conditions of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm. For the past two years Management at the local level has refused to utilize proposals and Memorandums from the Local Union, hence relying solely on mandatory overtime, volunteer overtime, and augmentation to manage more than half of the correctional services roster.

The agency as a whole has failed to assist MDC Brooklyn with the staffing crisis, hence allowing MDC Brooklyn to fail.  What are you waiting for, another loss of inmate life? Your indifference and continued failure to act, will bring the Federal Bureau of Prisons more negative notoriety.

In an effort to make you more aware of these inadequacies, I have attached copies of MDC Brooklyn's Correctional Services Roster.

The local union is requesting that the agency cease and desist with forcing staff members to work more than one post in a single shift. The Local is also requesting that the Agency adhere to Article 6 (b2), Article 18 (r,s), and Article 27 of the Master Agreement and provide a safe environment for all staff.

The Local Union is requesting that we meet in person to discuss these pressing concerns and devise corrective actions.

The parties devote up to 2( two) days for your written response before this situation is escalated to a third party to include the media, and the inmate advocates.

R.Barnwell, /R.BARNWELL

President, AFGE

Local 2005, CPL33

# **<u>EXHIBIT I</u>**

From the Desk of Warden

March 24, 2023

MEMORANDUM FOR INMATE POPULATION

FROM:     S. Ma'at, Warden

SUBJECT:    Planned Modified Operations

As the Warden of this facility, I am committed to providing a safe, secure, and orderly environment at MDC Brooklyn. My experience has taught me that effectively managing inmate behavior is critical to achieving this goal. I believe most inmates at the institution want to transfer to their next institution or be released back to their communities. Recently, it has been difficult for many of you, due to the increase of weapons, cellphones, drugs, and fights. We understand the impact it is having on running the institution.

I remain concerned, that we continue to find cell phones and illegal homemade weapons, with the only possible intent to cause grave harm to others. It is the responsibility of the staff at this facility to ensure the safety of everyone as well as to enforce all rules and regulations. There is no justifiable reason for any inmate to be in possession of a cell phone or weapon at any time or in any manner.

Therefore, this memorandum is declaring my decision to implement a planned lock-down on various floors and units to slow operations down, conduct shakedowns, and gather additional intelligence.

Consequently, destructive, manipulative, and aggressive behavior will not be tolerated. I expect all inmates to comply with these expectations and all others will uphold rules, maintain high levels of sanitation within your living areas, treat staff respectfully, and interact positively with each other.

<u>All inmates found in possession of a weapon or cell phone will be sanctioned aggressively through the local disciplinary process. In addition, to any criminal and DHO sanctioning which will be pursued through the FBI, the United States Attorney, and the sentencing Judges.</u>

It is important to remember, that all staff are responsible to ensure cells and lockers are free of all contraband, including weapons, cellphones, and drugs. You will be held accountable for these areas. Further, it is imperative to regulate the amounts of excessive property in each cell.

Correctional Services will implement a modified schedule for all units at the institution. As we transition the institution back to normal operations, we will continue to monitor any security issues, which endanger the safety of staff and inmates. Therefore, the length of the institution's modified operation will be based on observed acceptable behavior displayed by all inmates. (All times are approximate)

You should adhere to the rules and regulations of the institution, treat staff and fellow inmates with respect and follow all orders given by staff, especially during unusual times such as these. Additionally, all inmates are expected to adhere to cell sanitation and housekeeping standards.

Staff will and should continue to make rounds, refresh their knowledge of policy, and address any concerns that may arise. As the Warden, I welcome open communication as events transpire. Every attempt will be made to ensure the inmate population is provided showers, legal phone calls and visits, and nutritional meals throughout the course of this lock down, including one hot meal each day. You will be notified of any additional modifications to institution operations.

Your cooperation is expected, as we do everything to ensure the safety and security of our staff, inmates, and the public. Staff from various departments will be making rounds throughout the institution, so please be patient as we work through this critical time.

# EXHIBIT J



**U.S. Department of Justice**

Federal Bureau of Prisons

*MDC Brooklyn*

Brooklyn, New York 11232

From: C. Rodriguez, Captain

<u>Notice to the inmate population</u>

SUBJECT: Modified Institutional Operations

Effective Wednesday, July 17, 2024, MDC Brooklyn was placed on modified operations, following an inmate death. Due to the nature of this incident, a thorough investigation will be conducted to ensure the safety and security of all staff and inmates within MDC Brooklyn. Furthermore, it is the expectation of the Captain that inmates will live in a safe and secure environment. Violence in this setting leads to negative consequences such as injuries, death, prolonged lockdowns, disruption of operations and programs, and increased tension. Therefore, it is imperative all inmates adhere to established rules, expectations and respect one another. As a result of this incident, the inmate population will remain secured until further notice. Legal calls and legal visits will continue as normal, however social visits will be cancelled until further notice. Return to normal operations is strictly based on the investigation's results, in conjunction with inmate behavior and will be assessed daily.

<u>Aviso para los presos</u>

SUBJETO: Operaciones Modificadas

A partir del Miercoles, 17 de julio de 2024, MDC Brooklyn fue puesto en operaciones modificadas, después de la muerte de un recluso. Debido a la naturaleza de este incidente, se llevará a cabo una investigación exhaustiva para garantizar la seguridad de todo el personal y los reclusos dentro del MDC Brooklyn. Además, el Capitán espera que los reclusos vivan en un entorno seguro y protegido. La violencia en este entorno tiene consecuencias negativas como lesiones, muerte, operaciones modificadas prolongadas, interrupción de operaciones y programas y aumento de la tensión. Por lo tanto, es imperativo que todos los reclusos cumplan con las reglas y expectativas establecidas y se respeten unos a otros. Como resultado de este incidente, la población reclusa permanecerá asegurada hasta nuevo aviso. Las llamadas y visitas legales continuarán con normalidad, sin embargo, las visitas sociales se cancelarán hasta nuevo aviso. El regreso a las operaciones normales se basa estrictamente en los resultados de la investigación, junto con el comportamiento del recluso y se evaluará diariamente.

# **EXHIBIT K**



**U.S. Department of Justice**

Federal Bureau of Prisons

*MDC Brooklyn*

---

*Brooklyn, New York 11232*

**December 6, 2024**

MEMORANDUM FOR INMATE POPULATION

From: C. Haines, Captain

**Notice to the inmate population**

SUBJECT: Modified Institutional Operations

This is a notice to all I-62 inmates, that the unit will remain secured until further notice. During the past 30 days, unit I-62 has experienced multiple serious assaults involving weapons, that have resulted in inmates sustaining serious injuries. It is the expectation of the Captain and the Administration, that inmates and staff will live and work in a safe environment. Violence in this setting leads to consequential outcomes such as serious injuries, death, prolonged lockdowns, lapse in programming and a disruption in daily operations. It is imperative that all inmates adhere to the established rules and expectations set forth by the administration. Inmates can expect that legal calls, legal visits and social visiting will continue uninterrupted. Return to normal operations is strictly based on inmate behavior and will be assessed daily.

**Aviso a la población reclusa**

ASUNTO: Operaciones Institucionales Modificadas

Este es un aviso para todos los reclusos de la I-62, de que la unidad permanecerá asegurada hasta nuevo aviso. Durante los últimos 30 días, la unidad I-62 ha experimentado múltiples agresiones graves con armas, que han provocado que los reclusos sufran lesiones graves. La expectativa del Capitán y la Administración es que los reclusos y el personal vivan y trabajen en un ambiente seguro. La violencia en este entorno tiene consecuencias importantes como lesiones graves, muerte, confinamientos prolongados, fallos en la programación y perturbaciones en las operaciones diarias. Es imperativo que todos los reclusos cumplan con las reglas establecidas y las expectativas establecidas por la administración. Los reclusos pueden esperar que las llamadas legales, las visitas legales y las visitas sociales continúen sin interrupciones. El regreso a las operaciones normales se basa estrictamente en el comportamiento del recluso y será evaluado diariamente.

THE DISCLAIMER
*\*\*\*Esta es una traducción de un documento escrito en inglés, distribuido como una cortesía a las personas que no pueden leer inglés. Si resulta alguna diferencia o algún malentendido con esta traducción, el único documento reconocido será la versión en inglés. \*\**

# **EXHIBIT L**

October 27, 2025

The Honorable William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kuntz,

I am writing this letter in support of my friend, Justin Dixon, who is scheduled to appear before you for sentencing. I have known him for 20-plus years, and I would like to share my perspective on his character and the qualities I have seen in him over the years.

I have known Justin Dixon in both personal and professional capacities. The Justin I know is a family-oriented hard-working individual. Before the events that led to this case, I knew him to be a person of excellent character, integrity, and dependability. Before his incarceration, Justin Dixon consistently demonstrated honesty, respect for others, and a strong sense of responsibility. Throughout our friendship, he has approached every task with diligence and enthusiasm and is always willing to assist others when needed. Justin also shows good judgment and maintains a positive attitude in challenging situations.

Since his arrest, I have had the opportunity to speak with him constantly and have witnessed sincere remorse through conversations about his actions that brought him before the court. I truly believe that with the right support, opportunity, and guidance he will be able to reintegrate successfully back into society.

Your Honor I respectfully ask that you take this letter into consideration during sentencing as a reflection of his true character and potential for a fresh start. I know Justin Dixon to be a good person at heart, and I am confident that with guidance and opportunity, he can become a productive and responsible member of the community.

Thank you for your time and understanding.

Sincerely,
Cherelle George